**Jane DOE, Plaintiff–Appellee,**

v.

**LINDER CONSTRUCTION COMPANY, INC., Linder Realty Company, Inc., Elwood Carpenter and Pattie Rollins, Defendants–Appellants,**

**and**

**Robert Linder, Linder Development Company and Idlewild Court Homeowners' Association, a.k.a. and d/b/a Idlewild Court Homeowners' Association, Defendants.**

Supreme Court of Tennessee,
at Nashville.

Dec. 21, 1992.

---

Daniel B. Eisenstein, Niles S. Nimmo, Nashville, for plaintiff-appellee.

Douglas Fisher, Thomas Pinckney, Nashville, for defendants-appellants.

## OPINION

REID, Chief Justice.

This negligence action results from the rape of the plaintiff-appellee by two men who are not parties to the suit. The trial court granted the defendants-appellants' motion for summary judgment, and the Court of Appeals reversed and remanded for a jury trial.

The complaint charges that the defendants negligently allowed a key to the plaintiff's residence to be stolen by other parties who, thereby, gained access to her residence and raped her. The plaintiff, who is the purchaser of a residence in a "planned unit development," sued Linder Construction Company, the seller-builder of her residence; Elwood Carpenter, the seller-builder's construction supervisor; Linder Realty Company, the realtor; and Pattie Rollins, the realtor's employee, who sold the residence to the plaintiff. The plaintiff also sued Idlewild Court Homeowners' Association, a corporation, alleging it had breached its duty to "enforce the covenants" of the Association with regard to plaintiff's safety. That defendant is not a party to this appeal.

The trial court found that the criminal assault was an independent intervening act and dismissed the complaint. The Court of Appeals held that the case presents issues of fact for the jury. This Court's review of the evidence shows that the trial court properly granted summary judgment in favor of the defendants.

## FACTS

Although the plaintiff-appellee insists that there is "significant disagreement as to the inferences to be drawn" from the facts, the essential facts are not disputed. Linder Construction Company contracted with Samuel Carpenter, the son of its construction supervisor, Elwood Carpenter, for the painting and wallpapering of houses as they were completed in the 35–lot development. At the time of the assault, Samuel Carpenter had been working for Linder Construction Company for approximately 14 months as an independent contractor and had been paid on the basis of work done. With the seller-builder's knowledge and permission, he frequently worked at night and on weekends. Carpenter apparently had problems with alcohol and had three convictions of DUI. He admitted to the occasional use of drugs. The record discloses no other evidence of bad character or criminal conduct.

Several months before the assault, while Samuel Carpenter was painting the interior of a house that subsequently became a "model home" and the office of the realty company, the locks and keys for the outside doors of the house were delivered by the supplier. The supplier stored them in the fireplace of the house. Carpenter,

without anyone's knowledge, took one of the several keys to the front door lock. His stated purpose for taking the key was to have access to the restroom and kitchen facilities while working at night and on weekends when the house was locked. During the extended time between Carpenter's taking of the key and the assault, Samuel Carpenter did not use the key to the model house for any improper purpose. Since it was used as a sales office by the realty company, the model home was frequented during working hours by other workers on the project, realtors and prospective purchasers.

When a house in the development was sold, Rollins would offer to keep a key on behalf of the seller so that "punch list" items, agreed upon by the seller and the buyer at the time of sale, could be completed while the purchaser was at work or otherwise away from the residence. These "pass keys" were kept in the closet of Rollins's office in the model home, and the key to each house was tagged with a number corresponding to the lot number on which the house was located. The procedure whereby the keys were used was clearly established and followed by Elwood Carpenter, who, inaccurately described in the dissent as "the on-site superintendent," Dissent (Daughtrey, J.) at 187, a landlord-tenant term, was the construction supervisor of the project and, as such, was responsible for the "punch list" items agreed to at closing. Carpenter would take the keys needed that day from the office closet, put them onto his own key ring, and at the end of each day, return the keys to the box in the closet. The model home was locked at night and at all other times except when Pattie Rollins or another realtor was present. Although some buyers decided against allowing Rollins to keep a key to their house, that arrangement was made by the plaintiff and Rollins when her sale was closed. The arrangement, which is described in the plaintiff's brief as "a normal business practice," was for the mutual convenience of the defendants and the plaintiff.

About a week before the plaintiff was assaulted, Clinton Osborne came to Nashville from Ohio to visit his cousin Samuel Carpenter. Osborne worked some with Samuel Carpenter painting, but he mostly just "goofed off." Osborne, described in the dissent as a "dangerous person," Dissent at 189, which in hindsight is accurate, had served a penitentiary sentence in Ohio for assault and, unknown to Samuel Carpenter or the defendants, was a fugitive when he came to Tennessee. The extent of the defendants' knowledge about Osborne was that Elwood Carpenter knew he had served time in prison in Ohio.

On the night of the assault, Samuel Carpenter used his key to enter the model home. After locating the box of pass keys, he identified the key tagged with the lot number of the plaintiff's house and took it. He and Osborne then entered the plaintiff's house with the pass key and raped her. Both men were convicted of the crime.

The trial court found that the criminal assault was not reasonably foreseeable under the circumstances and granted the defendants' motion for summary judgment. The Court of Appeals found that these facts were sufficient to present jury questions with regard to the handling and storage of the key to the model home, the control of the "pass keys," and the "employment" of Samuel Carpenter, a person "of known irresponsible character."

## STANDARD OF CARE

The plaintiff asserts this is a case of first impression in Tennessee. Apparently there is no reported decision from this or any other jurisdiction in which a plaintiff has undertaken to impose liability under circumstances similar to those presented in this case. Both the plaintiff and the dissent characterize the case as "unique." Dissent at 194.

In attempting to establish the duty of care owed the plaintiff by the defendants, the plaintiff, and the dissent, acknowledge that the decisions of Tennessee courts provide no precedent and rely upon "recent developments in this area of the law." The dissent advocates that Tennessee join the "'revolution' in this area of the law,"

which would require "a sudden judicial rejection of well established precedent." Dissent at 192. The plaintiff undertakes to find support for her position in the law regarding the duty of shopping center operators to third parties for the criminal acts of strangers, *Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn.1975); the duty of landlords to tenants for the criminal acts of strangers, *Tedder v. Raskin*, 728 S.W.2d 343 (Tenn.App.1987); the duty of innkeepers (hotel or motel operators) to registered guests for the criminal acts of strangers, *Zang v. Leonard*, 643 S.W.2d 657 (Tenn. App.1982); and the duty of "condominium owners' associations" to members for the criminal acts of strangers, *Francis T. v. Village Green Owners Ass'n.*, 42 Cal.3d 490, 229 Cal.Rptr. 456, 723 P.2d 573 (1986). The Tennessee cases relied upon by the plaintiff set forth settled legal principles relating to the particular relationship presented in each case; however, those cases involve situations and relationships greatly different from the case at hand and constitute no authority for the legal principles advocated by the plaintiff. A significant difference between those cases and the present case is that in the present case, the criminal tortfeasor is not a "stranger" to the defendants but a person who was authorized by contract to be on the premises, and who gained access to the plaintiff's residence by criminal or unauthorized acts committed against the defendant-seller as well as the plaintiff. Another significant difference is that the defendants were not the plaintiff's landlord, lessor, or host, and consequently, did not owe the plaintiff the duty owed tenants, lessees, or guests. The defendants were not owners or occupiers of the plaintiff's premises, they had only the right to enter the premises at the plaintiff's convenience and for the purpose of completing the performance of the contractual obligation incident to the sale of the property. Aspects of those relationships which are not present between the defendants and the plaintiff include a contractual obligation regarding security or maintenance and a control over the plaintiff's premises. The arguments advanced by the plaintiff and the cases relied upon, might be applicable to the plaintiff's suit against the defendant Idlewild Homeowners Association, Inc., which, though a party to the suit, is not a party to this appeal. According to the allegations of the complaint, that defendant, incident to the covenants of the association, owed a duty to provide security to the association members. The liability of the association is not an issue before the Court.

■ The duty owed the plaintiff by the defendants was, as in all cases, that of reasonable care under all of the circumstances. The duty due the plaintiff arose from the contractual arrangement whereby a key to the plaintiff's residence was retained by the seller for the mutual benefit of the plaintiff and the defendants. The duty, though much more limited, may be compared to that of a landlord, who, by agreement and for the parties' mutual benefit, has access for a limited purpose to a tenant's premises.

As stated previously, there appears to be no reported decision in which the purchaser of a residence sued the seller for the criminal assault committed by third parties. The Court of Appeals in *Tedder v. Raskin*, 728 S.W.2d at 349, in an excellent opinion written by Judge Cantrell, reviewed the development of the common law in this state regarding the duty of landlords to protect tenants against the criminal acts of third parties. In that case, tenants brought a negligence action against the landlord for injuries sustained when a bullet fired during a robbery in the adjoining apartment came through the wall and struck the plaintiff's minor child. The plaintiffs claimed that the defendant breached a duty to provide them a reasonably safe place to live by failing to protect the plaintiffs and their child from dangers inherent in living next door to an alleged drug dealer. The Court of Appeals affirmed the trial court, which had granted a directed verdict for the defendants.

The court approved the succinct statement of the standard of care required of innkeepers in *Zang*, 643 S.W.2d at 657, as the standard applicable to landlords, as follows:

The measure of the liability of the possessor of land to invitees is *due care under all the circumstances* including the nature and use of the land, the nature of the invitation, the nature of the relationship with the invitee, the opportunity of the possessor and the invitee to know and avoid existing or probable dangers, and any and all other factors which would challenge the attention of the possessor and/or invitee to the probability of danger to the invitee and produce the precautions which a reasonably prudent person would instigate under the same or similar circumstances. (Emphasis added).

*Tedder,* 728 S.W.2d at 348 (quoting *Zang,* 643 S.W.2d at 663). The *Tedder* court then stated that ordinary principles of negligence apply to landlord-tenant situations and, further, that the landlord is not an insurer but can be held liable when his or her failure to exercise reasonable care under the circumstances was the proximate cause of injury to the tenant.

 If the defendants failed to exercise reasonable care under the circumstances then they breached their duty to the plaintiffs. The term reasonable care must be given meaning in relation to the circumstances. *McCormick v. Waters,* 594 S.W.2d 385, 387 (Tenn.1980). Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury. *Leach v. Asman,* 130 Tenn. 510, 514, 172 S.W. 303 (1914). The risk involved is that which is foreseeable; a risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable. Foreseeability is the test of negligence. If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability. *See Spivey v. St. Thomas Hospital,* 31 Tenn.App. 12, 211 S.W.2d 450, 456 (1948). "[T]he plaintiff must show that the injury was a reason-ably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury." *Tedder,* 728 S.W.2d at 348. Foreseeability must be determined as of the time of the acts or omissions claimed to be negligent.

Negligence already has been defined as conduct which falls below a standard established by the law for the protection of others against unreasonable risk of harm. The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. Risk, for this purpose, may then be defined as a danger which is apparent, or should be apparent, to one in the position of the actor. The actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward "with the wisdom born of the event." The standard is one of conduct, rather than of consequences. It is not enough that everyone can see now that the risk was great, if it was not apparent when the conduct occurred.

5 Prosser and Keeton, *The Law of Torts* § 31, p. 170 (1984) (footnotes omitted). With regard to the criminal acts of others, the Court in *Tedder* stated:

If the injury was not reasonably foreseeable, then the criminal act of the third party would be a superseding, intervening cause of the harm, relieving the landlord of liability.

*Tedder,* 728 S.W.2d at 349.

Based upon the principles stated in *Tedder,* the duty owed the plaintiff by the defendants in this case is not that of an innkeeper to its guest or a landlord to a tenant, but only to exercise reasonable care in managing the key to the residence. The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries. *Corbitt,* 496 S.W.2d at 918. Analysis of "all the circumstances" of this case shows that there was no rea-

sonable basis on which to foresee any danger to the plaintiff.

Samuel Carpenter used two keys to accomplish the criminal acts that caused injury to the plaintiff. It is important to separate the issues involved in the handling of each key to determine whether evidence of negligence by the defendants may be found anywhere in the sequence of events leading up to the rape of the plaintiff.

The plaintiff claims, somewhat tentatively, that the defendants' first negligence, characterized as "potential negligence," was in allowing Samuel Carpenter to obtain possession of the key to the model home. The Court of Appeals agreed. However, the only evidence cited by that court in support of its conclusion that the defendants "reasonably knew or should have known of the probability of an occurrence such as the one that caused the plaintiffs injuries," was that Samuel Carpenter was of "known irresponsible character." The record shows that this "irresponsible character" consisted of DUI convictions, alcohol dependency, and the occasional use of drugs, none of which are shown to be probative of a propensity to commit violent crimes against property or persons. During the 14 months that Carpenter worked at the job site, there were no complaints made against him, and there is no evidence that he used the key for any unlawful purpose during that time. Even though the Court of Appeals based its reversal in part upon the negligent hiring of Samuel Carpenter, that argument is not asserted on this appeal.

■ Although the plaintiff mentions the "first key," claiming its handling was "potential negligence," her main insistence is that the defendants' proximate negligence was their control of the "second key," the key to her residence. In her statement of "undisputed facts," from which she claims a jury could draw inferences of negligence, the plaintiff refers only to the location of the "pass keys" and persons who had access to those keys while the model home was open. The facts claimed by the plaintiff to constitute negligence are as follows:

[T]he Defendants stored the pass keys in a common area which was frequented by prospective buyers, construction workers, and staff.

[T]he model home was left unattended by the Defendants and unauthorized persons were allowed to enter the model home when no one was present.

[T]he pass keys were clearly identified by lot number and were stored in an unlocked closet in an unlocked box.

[N]o security procedures were instituted to control access to the pass keys and such keys were never inventoried.

These facts, even if found by a jury to be true, are not sufficient to support a finding that the procedures followed and security measures taken in handling the pass keys were less than reasonably prudent. The facts relied upon by the plaintiff show that keys tagged with appropriate lot numbers were kept in a closet that opened into an office located in a building containing several rooms, which were accessible to persons doing business with the occupants, the development builders and realtors. The persons who had access to the model home-office building were prospective purchasers of residences, suppliers, craftsmen, and others who ordinarily would be present at such a business location. Though they were present in the sales office, there is no showing that any of these persons had an opportunity to steal a key, nor is there any showing that such persons were inclined to steal a key. More importantly, none of the people doing business at the model home actually stole a key or harmed the plaintiff or anyone else. The key was not taken by a "dangerous character" or one engaged in "criminal activity." In fact it was taken before the sales office had been completed and by a contract painter-paper hanger who lawfully was working on the premises, and about whom the worst that could be said was that he smoked marijuana and drank too much beer. Under these circumstances, it was not reasonably foreseeable that the contractor would commit two secret, separate acts, one unauthorized and one criminal, in order to obtain possession of a key to commit another criminal act. A reasonably prudent person under these cir-

cumstances would not feel compelled to guard against these unexpected criminal acts. It cannot be said, therefore, that the harm was foreseeable and therefore the defendants' conduct regarding the pass keys fell below the standard of care required in this situation.

■ The plaintiff insists that evidence of "unauthorized entries" into other occupied houses in the development was sufficient to establish that the assault was foreseeable. That evidence consisted of the plaintiff's testimony that others had complained that "there were problems with their homes." The plaintiff was able to provide only the vaguest information about two incidents, the disappearance of a can of tuna and an unflushed toilet. According to the plaintiff, the toilet incident involved a house owned by Meyers. However, according to the construction superintendent, Meyers complained to him of the toilet incident, which occurred after all keys to the Meyers' house had been returned to him. The superintendent also said that another purchaser, Syke, complained of a "forced entry," rather than an "unforced entry," and that some items had been stolen, not as the result of the claimed entry but from his yard. Even though the complaint charges that the defendants were negligent in failing to warn the plaintiff of these "unforced entries," she stated in discovery that she learned of these events in casual conversations with the neighbors prior to the assault when she was out walking in the neighborhood. The plaintiff could not remember the names of any other persons who had complained. None of the owners testified.

Neither the trial court nor the Court of Appeals found the evidence of complaints by other purchasers to be significant. In fact neither court even mentioned it. The dissent's characterization of this testimony as evidence of "unauthorized," but unforced entries and "breaches of security" dignifies it far beyond its worth. Dissent at 190. Holding that such tenuous circumstances may constitute notice that produces foreseeability and therefore duty would truly "revolutionize" the law of negligence. Finding circumstances such as minor

thefts, unexplained use of a bathroom, and unsubstantiated rumors to be sufficient notice on which to base liability for subsequent criminal assaults is not the law in Tennessee or any other jurisdiction.

The dissent, despite the disclaimer that this is not a case involving a landlord and tenant, undertakes to impose on the defendants the same duty that rests upon a landlord in cases like *Lay v. Dworman*, 732 P.2d 455 (Okla.1986), in which a tenant was assaulted by an intruder who gained entrance into her apartment through a door with a broken lock which the landlord had failed to repair after receiving notice, even though the landlord had knowledge that other assaults had occurred at the same apartment complex. Of course, all of the elements of a cause of action were present in that case. The duty arose from the landlord-tenant relationship, the acknowledged duty to repair, and the notice of danger. The proximate cause was the failure to repair.

In *Kline v. 1500 Massachusetts Ave. Apartment Corp.*, 439 F.2d 477 (D.C.Cir. 1970), said by the dissent to be the seminal case in the development of landlord liability, the court held:

> However, there is no liability normally imposed upon the one having the power to act if the violence is sudden and unexpected provided that the source of the violence is not an employee or the one in control.

439 F.2d at 483, Dissent at 191–92. The decision of the Court in *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991) is no authority for the plaintiff's position in this case. The legal principle affirmed in *McClenahan* is the same principle that controls the instant case, the foreseeability of injury caused directly by a criminal act. The foreseeability of probable injury resulting from the act of leaving the ignition key in an automobile stopped in a heavily traveled location was recognized in *McClenahan*. The Court then held that the fact that the automobile was parked on private property, and therefore not in violation of T.C.A. § 55–8–162, did not vitiate the general principles of foreseeability and conse-

quent liability. The difference in *McClenahan* and this case is that in *McClenahan* the proof would support a finding of foreseeability and in this case it would not.

Contrary to the plaintiff's contention, the Restatement (Second) of Torts § 323(a) (1965) does not support her position:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm....

The principle stated is not applicable to this case. The defendants did not offer to *render any service* to the plaintiff, they only agreed to complete the "punch list" items. The obligation assumed by the defendants did not extend to that of *protecting the plaintiff from physical harm*, and the defendants did not *fail to perform any obligation assumed.* This rule might find applicability to obligations assumed, according to the complaint, by the homeowners' association, but not the builder-seller and its agents.

Simply put, there is no authority for holding that in the circumstances presented by this record the defendants were required to foresee that the painter-wallpaper hanger would steal a key to a building which later would become the sales office, that he would use that key in order to steal a key to one of the completed residences, and that he would use the second key to commit a criminal assault upon the occupant. There is no precedent or responsible authority which requires the builder-seller, under the circumstances of this case, to foresee a crime upon a crime upon a crime.

### PROXIMATE CAUSE

█ In addition to the finding that the defendants' conduct did not fall below the standard of care, another fatal flaw in the plaintiff's case is the lack of proximate causation, an essential element in proving a case of negligence. As stated in *Tedder,* "[t]he plaintiff must further prove that the [defendant's] failure to act was the proximate cause of the injury." 728 S.W.2d at 348. This Court has held:

> "An injury that is the natural and probable consequence of an act of negligence is actionable, and such an act is the proximate cause of the injury. But an injury which could not have been foreseen or reasonably anticipated as the probable result of an act of negligence is not actionable and such an act is either the remote cause, or no cause whatever, of the injury."

*Ward v. University of the South,* 209 Tenn. 412, 354 S.W.2d 246, 250 (1962) (quoting *Moody v. Gulf Refining Co.,* 142 Tenn. 280, 218 S.W. 817 (1919)). The facts upon which the plaintiff relies, even assuming they were acts of negligence, were not the proximate cause of the plaintiff's injury. "Proof of negligence without proof of causation is nothing." *Drewry v. County of Obion,* 619 S.W.2d 397, 398 (Tenn.App. 1981). Proximate cause:

> ... is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of the actor's conduct.... [T]he consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond. But any attempt to impose responsibility upon such a basis would result in infinite liability....

*Prosser and Keeton on the Law of Torts,* § 41, p. 264 (5th ed. 1984). "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set...." *Id.*

As previously discussed, the acts of rape were criminal acts of which the defendants had no warning and which they had no reason to believe would occur. As the court in *Tedder* held, "[i]f the injury was not reasonably foreseeable, then the criminal act of the third party would be a superseding, intervening cause of the harm, relieving the [defendants] from liability."

728 S.W.2d at 348. The Court of Appeals was confronted with a similar situation in *Corbitt v. Ringley–Crockett, Inc.,* 496 S.W.2d 914 (Tenn.App.1973), and found, as follows:

> So, the question that will determine [whether the proof is insufficient to warrant a jury finding favorable to the plaintiff] is whether or not there is any proof in the record from which it can be said from the facts that the owner or lessee of the Coliseum in Knoxville reasonably knew or should have known of the probability of an occurrence such as the one which caused plaintiff's injuries. We are of the opinion there is not.
>
> In order for plaintiff to recover in this case, the proof must be such so that it can be said that it was reasonably foreseeable by the defendants that the plaintiff would be waylaid and robbed in the restroom. Reviewing the proof in the light most favorable to plaintiff as we must, (citation omitted), we are unable to find proof that would warrant such a conclusion. All of the proof shows that such an occurrence as complained of had never before happened in the Coliseum. Previous non-occurrence of an event, standing alone, does not necessarily mean that such event is not foreseeable. However, in the instant case, coupled with the previous non-occurrence there is the uncontradicted fact that the injury was caused by the sudden criminal attack of third persons, without any warning to the plaintiff or to anyone else. In *Brodie v. Miller,* [24 Tenn.App. 316, 143 S.W.2d 1042 (1940) ], it was held that the law does not place the onerous duty upon an owner of anticipating the criminal acts of another, unless the criminal act is the natural and spontaneous result of the act or failure to act of the owner. *The criminal act complained of by the plaintiff in this case cannot be said to be the natural or normal result of any act of the defendants.*

496 S.W.2d at 917–918 (emphasis added).

It is important to emphasize again that the tortfeasor in this case was not a stranger to the defendants. He was a contractor whose duties, pursuant to his contract with the seller-defendant, required his presence in the building that became the model home and office of the defendants, when the key to that building, which later gave him access to the building after working hours, was stolen. The key was not taken, as claimed by the plaintiff, as a result of "the [defendants' storing of] the pass keys in a common area frequented by prospective buyers, construction workers and staff," nor as a result of "the model home [having been] left unattended by the defendants and unauthorized persons [having been] allowed to enter the model home when no one was present," nor as a result of "the pass keys [having been] clearly identified by a lot number and ... stored in an unlocked closet in an unlocked box," nor as a result of "no security procedures [having been] instituted to control access to the pass keys and such keys [never having been] inventoried."

Instead, access to the plaintiff's residence was accomplished by the unauthorized taking from the defendants' possession the key to the model home, the locking of which was one of the protections against theft of the pass keys. The taking of the key to the model home was the efficient means whereby access to the plaintiff's residence was accomplished. The key to the plaintiff's residence was obtained by unauthorized acts (characterized as criminal by both the plaintiff and the defendants) committed against the Seller-defendant with which the tortfeasor had a contractual relationship. Therefore, the facts which must be considered in determining whether the evidence presents a jury question, are those relating to the taking of the key to the model home.

The criminal acts of Carpenter and Osborne were unforeseen, intervening causes of the plaintiff's injuries. "If the defendant can foresee neither any danger of direct injury, nor any risk from an intervening cause, the defendant is simply not negligent." *Prosser and Keeton on the Law of Torts,* § 44, p. 311 (5th ed. 1984). In *Ward,* the Court, in sustaining the dismissal of the complaint for failure to state a cause of action, stated:

The test of liability under the law of intervening cause requires a person to anticipate or foresee what usually will happen. It does not require him to anticipate and provide against what is unusual or unlikely to happen, or that which is remotely possible, but whether it was probable according to the usual experience of persons.

354 S.W.2d at 250.

■ Ordinarily, the proximate cause of an injury is for the jury, but, where the facts are not controverted, the question of proximate or intervening cause is for the trial court. *Brodie v. Miller*, 24 Tenn.App. 316, 143 S.W.2d 1042, 1045 (1940) (citing *Southeastern Greyhound Lines v. Groves*, 175 Tenn. 584, 136 S.W.2d 512, 513 (1940)). The *Brodie* court stated:

Lastly, it is insisted that the question of proximate cause is a jury question and whenever the question is doubtful or debatable, that the court should submit it to the jury.... The remedy of leaving the doubtful questions to the jury does not seem to be adequate, for the court is better qualified to lay down the duties and responsibilities growing out of a conceded state of facts than the jury. We do not believe that it was intended by the discussion of the issue found in this case to change the practice in this state; here the trial judge is the witness of the law to the jury. And it is his duty to define the duties and responsibilities of the parties arising out of the theory of the plaintiff as well as of the defendant; the sole function of the jury is to decide the facts and to apply the principles as given them by the court.

143 S.W.2d at 1046. The relationship between the assault and the acts of the defendants claimed to constitute negligence is so problematic that there can be no liability as a matter of law.

## STANDARD OF REVIEW

■ For a negligence case to go before a jury, the plaintiff has the burden to present facts sufficient to establish the necessary elements of negligence. The standard in a negligence case is that,

If, as a matter of law, the plaintiff has failed to allege or prove facts sufficient to establish notice, the existence of the duty to act, breach of the duty, or proximate cause, dismissal, summary judgment, or a directed verdict would be appropriate.

*Tedder*, 728 S.W.2d at 349 (Tenn.App.1987). More succinctly, "[t]he plaintiff in a negligence case must offer some material evidence showing the existence of a duty and an injury proximately caused by a breach of that duty." *Id.* The standard of review in this case, then, is whether there is any disputed genuine issue of material fact concerning the elements of the alleged cause of action. If not, the dismissal of the complaint must be affirmed.

Many cases in which the plaintiff was injured by the criminal acts of persons other than the defendant have been decided by the Tennessee appellate courts against the plaintiff for failure to present facts sufficient to establish the elements of negligence. For instance, in *Cornpropst v. Sloan*, 528 S.W.2d 188 (Tenn.1975), a shopper who was assaulted in a shopping center parking lot brought an action in negligence against the owners of the shopping center and the businesses located in the center. In affirming the trial judge's dismissal of the action upon finding no breach of duty and no proximate cause, the Court stated:

At common law, a private person or corporation, as distinguished from governmental units, had no duty whatsoever to protect others from the criminal acts of third parties. That general rule has remained steadfast in the tort law of this country, despite the exceptions that have appeared from time-to-time, where special relationships and special circumstances have combined to impose liability.

*Cornpropst*, 528 S.W.2d at 191. The Court then reviewed the law generally and the case of *Railroad v. Hatch*, 116 Tenn. 580, 94 S.W. 671 (Tenn.1906) (absent reasonable grounds for an apprehension of danger the railroad would not be liable for an attack on one passenger by another), and stated:

The significance of *Hatch* to our inquiry is that where the highest degree of care characterized the relationship, the criminal acts of third parties imposes no liability unless there are present special circumstances that create in the minds of reasonable men an apprehension of danger.

*Cornpropst*, 528 S.W.2d at 192. Finally, the Court approved the following statement from *Corbitt v. Ringley–Crockett, Inc.*, 496 S.W.2d 914 (Tenn.App.1973), in recognizing one special circumstance:

We hold that if the owner is to be held liable for the sudden criminal acts of third persons there must be a showing that the owner was on notice in some manner of the imminent probability of the act. Otherwise, there can be no issue for jury determination. There is no such showing in this record. The Trial Court should have directed a verdict for the defendants.

*Corbitt*, 496 S.W.2d at 919.

## CONCLUSION

To hold as negligence the failure to prevent the theft or unauthorized taking of a key by workers or others lawfully on a construction site, under the circumstances of this case, would place an unrealistic burden on contractors and other employers. As stated in *Prosser*:

On its face, the problem is one of whether the defendant is to be held liable for an injury to which the defendant has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which the defendant is not responsible. In its essence, however, it becomes again a question of the extent of the defendant's original obligation; and once more the problem is not primarily one of causation at all, since it does not arise until cause in fact is established. It is rather one of the policy as to imposing legal responsibility.

*Prosser* at 301. Even though the facts of this case are unique, the law of this state with regard to the legal issues presented is well settled.

The judgment of the Court of Appeals is reversed, and the judgment of the trial court granting summary judgments is affirmed. Costs are taxed to the appellee.

DROWOTA, O'BRIEN and ANDERSON, JJ., concur.

DAUGHTREY, J., dissents.

DAUGHTREY, Justice, dissenting.

Because I agree with the conclusion of the Court of Appeals that this case should have been submitted to a jury on at least one theory of negligence,[1] I respectfully

1. The complaint contains three theories of recovery: negligence in the handling of the key to plaintiff's house, negligence in the hiring and supervision of workers at the subdivision where the house was located, and fraudulent misrepresentation in the sale of the house. The latter two theories were not mentioned by the trial court in the order of summary judgment, nor were they discussed by the Court of Appeals in its opinion. This is unfortunate, because it appears as to the second theory, at least, that Tennessee law might have permitted recovery. The majority opinion argues that the defendants are not liable for injuries caused by an employee, but then takes the inconsistent position that Sam Carpenter was not an employer, but an independent contractor. Under existing Tennessee law, however, a defendant may be held liable for the negligent hiring or supervision of an independent contractor. *See Dill v. Gamble Asphalt Materials*, 594 S.W.2d 719, 722 (Tenn. App.1979).

Moreover, because of the supervisory control and direction exercised by both Elwood Carpen-

ter and Pattie Rollins, it seems clear that Sam Carpenter was an employee, rather than an independent contractor. It is also clear that Sam had "hired" Clint Osborne to work with him at Idlewild Court and that Elwood Carpenter, despite his knowledge of Clint Osborne's unsavory background, did nothing to remove Osborne from the premises and thus ratified Sam's conduct. I believe that a jury could find that both Sam Carpenter and Clint Osborne were "employees" of the defendants.

Under the doctrine of respondeat superior, an employer may be held responsible for the acts of his employee, but only to the extent that the employee is acting within the scope of the employment at the time. Hence, most jurisdictions, including Tennessee, have held that an employer is not liable to third persons for injuries resulting from the criminal acts of an employee, because such acts are ordinarily outside the scope of employment.

Most jurisdictions also recognize an exception to this general rule of non-liability, however.

dissent from the majority's decision to reinstate the order of summary judgment entered in the defendants' favor.

In general terms, this case involves the question of a defendant's liability for criminal acts by third persons that result in harm to the plaintiff. Specifically, the plaintiff in this case claims that the injury she suffered was caused by the defendants' negligent handling of a key to her home, which thereby fell into the possession of two men who used it to gain unauthorized entry and rape her. The defendants contend (and the majority holds) that they owed no duty to the plaintiff as a matter of law and that, in any event, the injury she suffered was not reasonably foreseeable, but was the result of an intervening cause.

The appeal thus raises an issue that has been addressed by a number of courts around the country, in a wide variety of circumstances: is a person who assumes control of the security of a building (including those to whom a house key is entrusted) liable for damages when that security is breached because of negligence (including the negligent handling of the key)?

To the reader of the two opinions filed in this case, the split will look at first like a disagreement about the factual record. Indeed, there is a dispute concerning several very material facts, which would normally produce the conclusion that the case should

---

An employer will be held responsible for the criminal acts of an employee, independent of the doctrine of respondeat superior, where the employer knew or should have known that the employee was a threat to others. *See generally Williams v. Feather Sound, Inc.,* 386 So.2d 1238 (Fla.App.1980), and cases collected at Annot., *Employer's Knowledge of Employee's Past Criminal Record as Affecting Liability for Employee's Tortious Conduct,* 48 A.L.R.3d 359 (1973); Annot., *Landlord's Tort Liability to Tenant for Personal Injury or Property Damage Resulting from Criminal Conduct of Employee* 38 A.L.R.4th 240 (1980). In many of the reported cases permitting recovery by an injured plaintiff, the employer was aware of the employee's propensity for violence prior to the assault in question, just as Elwood Carpenter was aware of Clint Osborne's criminal background in this case. *See, e.g., LaLone v. Smith,* 39 Wash.2d 167, 234 P.2d 893 (1951); *Mallory v. O'Neil,* 69 So.2d 313 (Fla. 1954); *Svacek v. Shelley,* 359 P.2d 127 (Alaska 1961); *Freeman v. Bell,* 366 So.2d 197 (La.App. 1978). More recent cases, especially those involving landlord and tenant, have imposed liability where the injured plaintiff established that the employer had been negligent in hiring, supervising, or retaining the employee who perpetrated the criminal assault. As one court summarized the rule, "knowledge before the incident in question of the employee's past history, prior complaints from other tenants, . . . and the degree of care in selecting, training and supervising employees are all factors which could make the [employer] liable for his employee's torts." *Thahill Realty Co. v. Martin,* 88 Misc.2d 520, 388 N.Y.S.2d 823, 825 (Civ.Ct.1976) (citations omitted).

While courts have been reluctant to place a burden of pre-employment investigation on employers in every case, they have held employers to a higher standard in the employment of workers who have access to private residences. *See, e.g., Kendall v. Gore Properties,* 236 F.2d 673, 679 (D.C.Cir.1956). In *Williams v. Feather*

*Sound, Inc.,* 386 So.2d at 1240, the court held that as long as the employee was hired only "to do outside work on the grounds of Feather Sound, during which he would have only incidental contact with the tenants, . . . [the employer] had [no] obligation on behalf of his company to make an independent inquiry concerning [the employee's] past if he did not want to." But, the court said, the employer "had a duty to make a reasonable inquiry about his background before transferring him to inside work and *giving him access to the townhouse passkeys.*" *Id.* (emphasis added).

In a case involving facts very similar to those now under review, *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn.1983), a tenant had been raped by the manager of an apartment complex who gained access to the plaintiff's residence by means of a passkey. The Minnesota Supreme Court held that the defendants were negligent in hiring someone with a felony record, because they failed to make an adequate investigation under circumstances showing "sketchy employment." According to the *Ponticas* court, the "[l]iability of an employer is not to be predicated solely on failure to investigate criminal history of an applicant, but rather in the totality of the circumstances surrounding the hiring, whether the employer exercised reasonable care." *Id.* at 913. This determination is universally recognized as being a question for the jury. *Id.* *Accord, Kendall,* 236 F.2d 673; *Williams,* 386 So.2d 1238. But it is well to note that two of the factual circumstances emphasized by the court in *Ponticas* were the employee's access to "the apartment of a young woman tenant" and the employee's possession of "a passkey permitting admittance to living quarters of tenants." 331 N.W.2d at 913. To the extent that the defendants took on the role of landlord in this case, by retaining a key and thereby creating access to the plaintiff's residence, both with and without her knowledge, the rule applied in *Ponticas* should also apply here.

not be decided on summary judgment. But more than just a disagreement over the facts and their reasonable interpretation, the division of opinion in this case also results from a different view of applicable law.

Resolution of the legal issues raised in this appeal requires that we revisit territory first explored in *Cornpropst v. Sloan*, 528 S.W.2d 188, 198 (Tenn.1975), in which the Court recognized the possibility of a defendant's liability for the criminal acts of others resulting in harm to a plaintiff, but held that there was no such cause of action against shopping center merchants for failure to guard against a sudden criminal assault committed on a customer in the shopping center's parking lot. We deal here with a question not specifically addressed in *Cornpropst*, but one which has increasingly attracted the attention of courts around the country in the almost two decades since our decision in that case.[2] Based upon a natural progression of the *Cornpropst* rule, our recent analysis of the common law theory of negligence in *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn.1991), and the principles embodied in the Restatement (Second) of Torts § 323 (1965), I am convinced that the trial court

erred in not submitting this case to the jury.

### 1. *Standard of Review.*

Under our rules of procedure, summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Tenn.R.Civ.P. 56.03. Because the defendants sought summary judgment in this instance, the plaintiff, Jane Doe, is entitled to have the evidence reviewed in a light most favorable to her claim, and all legitimate inferences from the facts must be drawn in her favor. *Smith v. Sovran Bank Cent. S.*, 792 S.W.2d 928, 930 (Tenn.App.1990).

Of course, in this as in any negligence action, the plaintiff must offer some material evidence of a duty on the part of the defendant and an injury proximately caused by a breach of that duty. *Tedder v. Raskin*, 728 S.W.2d 343, 349 (Tenn.App. 1987). These requirements, discussed in more detail below, admittedly require the resolution of many "difficult questions." *Id.* As the court in *Tedder v. Raskin* noted, however, "difficulty of analysis is no justification for denying a plaintiff recovery where the acts or omissions of the

**2.** This rapidly developing area of the law has spawned a large number of journal articles and case annotations. Among them are: Browder, *The Taming of a Duty—The Tort Liability of Landlords*, 81 Mich.L.Rev. 99 (1982); Rabin, *The Revolution in Residential Landlord–Tenant Law: Causes and Consequences*, 69 Cornell L.Rev. 517 (1984); O'Donnell, *Landlord Liability for Crime to Florida Tenants—The New Duty to Protect from Foreseeable Attack*, 11 Fla.St. U.L.Rev. 979 (1984); Cabrera, *Negligence Liability of Landowners and Occupiers for the Criminal Conduct of Another*, 23 Cal.W.L.Rev. 165 (1987); Selvin, *Landlord Tort Liability for Criminal Attacks on Tenants: Developments Since Kline*, 9 Real Est.L.J. 311 (1981); Note, *Landlord Liability for Crimes Committed by Third Parties Against Tenants on the Premises*, 38 Vand.L.Rev. 397 (1985); Note, *The Duty of a Modern Landlord to Protect His Tenants from Crime*, 29 How.L.J. 149 (1986); Note, *A Landowner's Duty to Guard Against Criminal Attack: Foreseeability and the Prior Similar Incidents Rule*, 48 Ohio St.L.J. 247 (1987); Comment, *Landlord Liability—Obligation to Maintain Adequate Security—A Comparative Study*, 59 Tul. L.Rev. 701 (1985); Annot., *Landlord's Obligation to Protect Tenant Against Criminal Activities of*

*Third Persons*, 43 A.L.R.3d 331; Annot., *Landlord Liability for Criminal Attack on Tenant*, 35 Am.Jur.Trials 1; Annot., *Condominium Associations' Liability to Unit Owner for Injuries Caused by Third Person's Criminal Conduct*, 59 A.L.R.4th 489; Annot., *Landlord's Tort Liability to Tenant for Personal Injury or Property Damage Resulting from Criminal Conduct of Employee*, 38 A.L.R.4th 240; Locke, *Condominium Association's Failure to Protect Residents and Guests from Criminal Attack*, 5 Am.Jur.P.O.F.3d 715; Annot., *Landlord's Liability Arising from Theft of Tenant's Property*, 58 A.L.R.2d 1289; Annot., *Employer's Knowledge of Employee's Past Criminal Record as Affecting Liability or Employee's Tortious Conduct*, 48 A.L.R.3d 359; Annot., *When Is Employer Chargeable with Negligence in Hiring Careless, Reckless, or Incompetent Contractor*, 78 A.L.R.3d 910; Annot., *Liability of Employer, Other Than Carrier, for a Personal Assault upon Customer, Patron, or Other Invitee*, 34 A.L.R.2d 371; Annot., *Modern Status of Landlord's Tort Liability for Injury or Death of Tenant or Third Person Caused by Dangerous Condition of Premises*, 64 A.L.R.3d 331; Annot., *Private Person's Duty and Liability for Failure to Protect Another Against Attack by Third Person*, 10 A.L.R.3d 619.

[defendant] caused the plaintiff's injuries." *Id.* Moreover,

[u]nder the standard [Tennessee has] adopted, [i.e.,] due care under all the circumstances, the fact finder must resolve these difficult questions on a case-by-case basis.... [I]ssues of proximate cause, intervening cause and contributory negligence are peculiarly issues for the trier of fact, not the court to determine. Such issues can only be decided by the court in cases where inferences from uncontroverted facts are so certain that all reasonable men, in the exercise of a free and impartial judgment, must agree upon.

*Tedder,* 728 S.W.2d at 349 (quoting *Brookins v. The Round Table, Inc.,* 624 S.W.2d 547, 550 (Tenn.1981)).

Obviously, in this case reasonable minds are not in agreement with regard to the sufficiency of proof offered on the question of summary judgment. Several material facts are in dispute. Although others are not disputed, the proper interpretation to be given those facts is sharply controverted. And, as one Tennessee court has noted:

Summary judgment for the defendant is not proper where, although the basic facts are not in dispute, parties in good faith may disagree nevertheless about the inferences to be drawn from those facts.

*Prescott v. Adams,* 627 S.W.2d 134, 138–39 (Tenn.App.1981).

### 2. *Factual Background.*

In this case, it is undisputed, for example, that the plaintiff was raped by two men, who surreptitiously entered the home where she and her four-year-old son were sleeping on the night of October 9, 1986. After assaulting Doe, one of the men stole several pieces of jewelry from her bedroom and then helped himself to food from her refrigerator while the second rape was being committed.

Doe recognized her assailants because she had seen both of them working in Idlewild Court, the residential development where she lived. Based upon her identification, Sam Carpenter and Clinton Osborne were arrested the next day; they were eventually convicted of rape and imprisoned. Doe then brought this suit for damages against the developer, the construction company, the realty company, and their agents, after the police investigation revealed that Sam Carpenter and Clinton Osborne had gained entrance to her house by use of a duplicate key that had been in the defendants' possession. One of those defendants is Elwood Carpenter, Sam Carpenter's father, who was the on-site superintendent at Idlewild Court and who hired his son to do painting and wallpapering there.

Doe had purchased her house, one of approximately 30 in a new "planned unit development" in Madison, Tennessee, in the summer of 1985. When she was first shown the house by real estate agent Pattie Rollins, it was unfinished. In her sales pitch, Rollins mentioned various selling points about Idlewild Court, including "good security." An advertising sheet for the development emphasized the fact that the outside doors to the units were secured by dead-bolt locks. Doe testified by deposition that one reason she decided to buy a house at Idlewild Court was that it appeared to be a safe place to raise her young son.

When Doe moved in the day after the closing on August 23, 1985, there were still two or three "unsolved problems" inside the house—the painter had missed covering a small area in the kitchen, and there was a tear in the wallpaper in one bathroom and a problem with the wallpaper seams in a second bathroom. At the closing, Rollins assured Doe that all necessary repairs would be made. As Doe later remembered the conversation, Rollins told her that Elwood Carpenter, the on-site supervisor, "had a master key to the homes" and would take care of these matters for her. They were put on what is known in the real estate trade as a "punch list." A few days after moving in, Doe discovered minor leaks in the plumbing and that problem, too, was added to the punch list. Later, she requested that a vent for a new clothes

dryer be installed. All the items on the punch list but one were taken care of shortly after the closing.

As Elwood Carpenter explained in his deposition, the "master key" to the houses in the development was operable only until a key specifically made for a given lock was used in that lock, at which time the lock automatically rekeyed itself and would no longer accept the master key. Hence, in order to make inside repairs on a resident's punch list, it was necessary to have access to a key specifically made for that particular house. Pattie Rollins testified that her usual procedure was to retain a key from the set of keys that was turned over to a new owner at the closing. Some residents knew that she had retained a key, she testified, but others did not. Rollins further testified that she did not recall the exact circumstances under which she had given Jane Doe her set of house keys. In Doe's deposition, however, she repeatedly refers to Elwood Carpenter's possession of a "master key," leaving the impression that she did not know that Rollins had retained a duplicate key to her home.

In any event, the painting and plumbing problems in Jane Doe's unit were cleared up a short time after she moved in. However, a lengthy dispute arose over the condition of the wallpaper in one of the bathrooms, and more than a year after Doe moved in, the matter had still not been resolved. Pattie Rollins apparently took the position that the wallpaper had been successfully patched; Jane Doe was dissatisfied and wanted the wallpaper completely replaced.

Despite the fact that she considered all the problems on the Doe punch list resolved, Rollins continued to retain the duplicate key to Doe's home. She had tagged it with Doe's lot number and kept it with other keys to units in Idlewild Court that had been similarly retained. They were stored in what Elwood Carpenter later referred to as a "plastic tray." Another witness described it as a plastic box with "see-through drawers." By all accounts, this plastic box was not only kept unlocked but had no locking mechanism on it. It was routinely stored in the closet of the front bedroom of the Idlewild Court unit that served as the "model home" for the development. Pattie Rollins used the bedroom as her office. Sometimes the key box was left on the floor of the closet, and sometimes on the top shelf. Rollins conceded that the closet itself was never locked.

Rollins did assert that the model home was routinely kept locked up and secure. But her own testimony, as well as that of Elwood Carpenter and Sam Carpenter, leaves that assertion open to dispute. Rollins testified that in addition to her model home key, other sales agents working for the realty company had keys to the unit, as did Elwood Carpenter. The model home was visited regularly by outside sales agents and by prospective customers.

Moreover, the construction workers at the development came in and out of the model home to get supplies, make phone calls, and use the bathroom. In his original deposition, Elwood Carpenter admitted that he knew that his son, Sam, had a key to the model home. According to Pattie Rollins's testimony, Sam Carpenter was not authorized to have a key to the model home. Nevertheless, Sam himself testified that he regularly kept beer and food in the refrigerator at the model home, for consumption when he worked at Idlewild Court after hours and on weekends. Although Rollins denied knowing that the workmen made routine use of the model home, the fact that someone was using the kitchen in this fashion could scarcely have escaped her attention.

The defendants argue on appeal that Sam Carpenter's access to the model home (and thus his access to the key to Jane Doe's house) was the result of an intervening criminal act—his own, in stealing a key to the model unit sometime prior to October 1986. Sam Carpenter admitted taking one of several keys provided for locks to the model home, after the "trim kit" containing the keys and locks was left lying in the fireplace by the distributor while the model home was under construction and before the locks were installed in the doors. The theft of this key should have been

noted months before the rapes occurred, at the time the locks were installed. But even if no one noticed the fact that a key was missing at that time, and thus took no action to account for it, Sam Carpenter's theft of the key is largely immaterial, because of his unimpeded access to the "key box" by means other than the stolen key. For example, he had painted the inside of the model home and could have taken the unsecured key to Jane Doe's house while he was in the model home for this purpose. Moreover, on the night that he allegedly stole the key to the Doe residence, he was in the model home after hours on two separate occasions, as indicated below. On one of those two occasions, the unit was unlocked, and he was able to enter without using his own key.

Finally, it is important to note that Elwood Carpenter *knew* that his son had possession of a key to the model home during the period in question but did nothing to stop him from using it. A jury could reasonably assume from Sam Carpenter's uninterrupted use of this key that it was the product of acquiescence, if not outright authorization.

In fact, Elwood Carpenter did nothing to stop Sam Carpenter's access to the model home and its contents, even though he knew that his son "had a drinking problem" and had seen Sam use marijuana. More importantly, Elwood Carpenter took no action when, during the week immediately before the rapes occurred, Clinton Osborne showed up on the construction site.

Osborne was well-known to Elwood Carpenter because he was the nephew of Carpenter's ex-wife. Carpenter also knew that Osborne had "been in trouble with the law" in Ohio and had spent eight or nine years in prison—as he recalled, for assault and arson. In fact, Osborne had apparently been most recently incarcerated following his conviction for armed robbery and was a fugitive from justice at the time he came to Tennessee, a fact which a superficial inquiry by Elwood Carpenter would have disclosed. In his deposition, Elwood Carpenter tried to minimize Osborne's involvement

by denying that Osborne had been hired to work at Idlewild Court. According to Elwood Carpenter, Osborne was just "loafing around the project with Sam while Sam was working." But Carpenter was forced to admit that he had seen Osborne with a paintbrush in his hand and knew that Osborne had been "inside of the houses" during the week in question. Elwood Carpenter testified that he was leery of Osborne and told Sam to "get him away from the job site." But he made no effort to eject Osborne from the premises himself, or to warn residents that a dangerous person was in the area.

The most significant indication that Sam Carpenter's theft of the model home key is simply irrelevant to the question of negligence in this case comes from evidence in the record about the events surrounding his possession of the key to Jane Doe's house on October 6, 1986, the evening of the rapes. According to Sam Carpenter's testimony, he and Clinton Osborne had worked together at Idlewild Court that day, drinking beer and "smoking dope" off and on during working hours. After they quit late in the afternoon, they went to the construction trailer, where they continued to drink beer. There they also discussed Clinton Osborne's proposal to get into Jane Doe's house for purposes of having sex with her. At some point, Sam Carpenter broke off the discussion and walked over to the model home to get some cheese and crackers he had stored there. When he arrived, he found the house unlocked and a real estate agent standing outside, waiting to show the model home to prospective buyers. The agent was apparently not a Linder employee, because Sam Carpenter had never seen him before. Carpenter went inside the house, without using his key, and retrieved his cheese and crackers from the kitchen. Although he did not take the key to the Doe home from the unsecured closet at that time, the significant point is that he could have. Instead, he returned to the construction trailer with the food, continued making plans with Clinton Osborne for later that evening, and ultimately returned to the model home to

get the marked key to Jane Doe's house, using his own key to enter the model home.

Sam Carpenter was subsequently asked, "If there [had not been] a key in the box that night, what did you plan to do?" Referring to Jane Doe, he responded, chillingly, "She'd have probably been safe." This testimony raises serious questions about how and why the homeowners' keys were retained, as well as questions about the lack of any security measures with regard to those keys. A jury might well conclude, for instance, that the key to Jane Doe's house had been retained in Pattie Rollins's office long after there was any legitimate reason to keep it. Moreover, that key, like others, was kept in an unlocked plastic box, in an unlocked closet, in a house to which many unauthorized persons (including outside sales agents and prospective buyers) had access. In its current state, the record fails to show that there was any company policy about use of the keys, or any precautions taken to secure them. According to Pattie Rollins, there was no list of whose keys were kept in the box, no sign-out sheet to indicate who might have had possession of them (and thus an opportunity to make a copy), no regular inventory of any kind, and no policy that they be returned to their owners as soon as possible under the circumstances. As to unsold homes or those still under construction, such a lackadaisical method (or lack of method) of operation posed no immediate risk of personal harm. But as to occupied residences, this conduct clearly raises a jury question on the issue of the defendants' breach of duty to use reasonable care in the handling of Jane Doe's key.

Moreover, the defendants had been put on notice that unauthorized entries had been made into several occupied residences at Idlewild Court, under circumstances that suggested unauthorized use of a key. One resident, a man named John Myers, had allegedly complained to Elwood Carpenter, Pattie Rollins, and Robert Linder that someone had been in his home on more than one occasion, without his permission; he was sure of this, he told Jane Doe, because "things [had been] rearranged or the commode had not been flushed when he felt like he didn't leave it in that shape." One couple had reported food missing from their home. Elwood Carpenter admitted that another resident, Randy Hutchison, was so upset when he learned that Carpenter had possession of a duplicate key to his home, that he demanded that it be handed over immediately and thereafter stayed home from work when repairs to the inside of his home had to be made. Finally, Elwood Carpenter conceded that still another occupied residence had been "burglarized" without any sign of forced entry. Various items were stolen from the house, and the matter was reported to the police. Even under these circumstances, Pattie Rollins took no steps to inventory or secure the keys in the model home. Indeed, when Jane Doe expressed some concern to Rollins after she unexpectedly saw Elwood Carpenter coming out of her house as she arrived home one evening, Rollins told Doe "not to worry about it, [that] he was bonded."

There is a dispute between the parties concerning the timing of these events, *i.e.*, whether the other unauthorized entries occurred before or after the unauthorized use of a key to Jane Doe's house that led to her rape, and thus whether defendants had been put on notice that a breach of security had occurred. But viewed in a light most favorable to Jane Doe's theory of the case, this evidence clearly presents a question for the jury on the issue of the defendants' breach of duty in failing to take appropriate action in response to a known risk.

### 3. *The Duty Owed to the Plaintiff.*

The first legal issue is, of course, whether under these facts there was a duty of care on the part of the defendants owed to the plaintiff in this case. The question is one of law, to be determined by the court.

The trial court found that the defendants had no duty to protect the plaintiff from the criminal acts of third persons, based on its reading of *Cornpropst* 528 S.W.2d 188. Specifically, the trial court held that the defendants' "failure to take steps to guard the key to plaintiff's home or to guard the plaintiff from harm," like the shopkeepers'

failure to prevent an attack in the parking lot in *Cornpropst,* was mere "nonfeasance" rather than "malfeasance," and thus was not actionable as a matter of law. A careful analysis of *Cornpropst,* however, demonstrates that the trial court's reading of that opinion is too broad and, further, that it fails to take into account the development of relevant law in Tennessee and elsewhere around the country.

In *Cornpropst,* the Court noted:

At common law, a private person or corporation, as distinguished from governmental units, had no duty whatsoever to protect others from the criminal acts of third parties. That general rule has remained steadfast in the tort law of this country, despite the exceptions that have appeared from time-to-time, where special relationships and special circumstances have combined to impose liability.

*Id.* at 191. Among the "special relationships" listed in the *Cornpropst* opinion were those of common carrier and passenger, innkeeper and guest, and public amusement operator and patron. The Court also took note of the landlord-tenant relationship analyzed in *Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 439 F.2d 477 (D.C.Cir.1970), quoting from that opinion with apparent approval as follows:

As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person. We recognize that this rule has sometimes in the past been applied in landlord-tenant law, even by this court. Among the reasons for the application of this rule to landlords are: judicial reluctance to tamper with the traditional common law concept of the landlord-tenant relationship; the notion that the act of a third person is committing in intentional tort or crime is a superseding cause of the harm to another resulting therefrom; the oftentimes difficult problem of determining foreseeability of criminal acts; the vagueness of the standard which the landlord must meet; the economic consequences of the imposition of the duty; and conflict with the public policy allocating the duty of protecting citizens from criminal acts to the government rather than the private sector.

But the rationale of this very broad general rule falters when it is applied to the conditions of modern day urban apartment living, particularly in the circumstances of this case. The rationale of the general rule exonerating a third party from any duty to protect another from a criminal attack has no applicability to the landlord-tenant relationship in multiple dwelling houses. The landlord is no insurer of his tenants' safety, but he certainly is no bystander. And where, as here, the landlord has notice of repeated criminal assaults and robberies, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to expect like crimes to happen again, and has the exclusive power to take preventive action, it does not seem unfair to place upon the landlord a duty to take those steps which are within his power to minimize the predictable risk to his tenants.

*Id.* at 481, quoted in *Cornpropst,* 528 S.W.2d at 195.

In *Kline,* the court focused on the element of control as the pivotal fact in the determination of liability arising from certain relationships, such as that of innkeeper-guest:

Other relationships in which similar duties have been imposed include landowner-invitee, businessman-patron, employer-employee, school district-pupil, hospital-patient, and carrier-passenger.

In all, the theory of liability is essentially the same: that *since the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control (and thus the power to act) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated.* However, there is no liability normally imposed upon the one having the power to act if the violence is

sudden and unexpected provided that the source of the violence is not an employee of the one in control.

*Kline* 439 F.2d at 482–483 (emphasis added).

*Kline* turned out to be the seminal case in the modern development of landlord liability. As Dean Prosser has noted:

Prior to 1970, there was no general tort duty on landlords to protect their tenants against criminal theft or attack. The situation began to change in that year, however, with the landmark decision of *Kline v. 1500 Massachusetts Avenue Apartment Corp.*, which imposed a duty of reasonable care upon the owner of an urban multiple unit apartment dwelling to protect its tenants from foreseeable criminal assaults. A growing number of courts have imposed similar duties of reasonable protection upon landlords to protect their tenants, and to protect others perhaps as well, from criminal attack, provided that such assaults are reasonably foreseeable and preventable.

Prosser and Keeton, *The Law of Torts* § 63 (5th ed. 1984).

One commentator, referring in 1984 to the "revolution" in this area of the law, has written:

Thus, in a single decade, landlords have lost the tort immunity that had been recognized for centuries, and have become responsible for the criminal acts of others that they could have prevented with reasonable care. Rarely in the history of American property law has there been such a sudden judicial rejection of well established precedent.

Rabin, *The Revolution in Residential Landlord–Tenant Law: Causes and Consequences*, 69 Cornell L.Rev. 517 (1984).

The first reported case to discuss a Tennessee landlord's liability to a tenant under such circumstances was *Tedder v. Raskin*, 728 S.W.2d 343 (Tenn.App.1987). There, a tenant sued her landlord when a stray bullet from a next-door neighbor's apartment came through the wall of her son's bedroom, penetrated the headboard of the bed in which he was sleeping, and wounded him in the head. The bullet had been fired during a scuffle between the neighbor and a man who was attempting to rob him in the midst of an illegal drug deal.

In *Tedder*, the Court of Appeals took note of the fact that "there [were] no reported Tennessee cases on the question of a landlord's liability for injuries resulting from criminal acts of third parties on the leased premises," but expressed doubt that "the landlord should be absolved of all liability for such injuries on the basis that he is under no duty whatsoever to take any precautions for the safety of his tenants." [3] *Id.* at 348. Instead, the court extended to landlords the same standard of care that applies to innkeepers: "due care under all the circumstances." *Id.* This means, the court noted, that "ordinary negligence principles apply." *Id.* The court further noted:

The landlord is not an insurer of his tenants' safety, but he can be held liable "where the injury of the guest (tenant) by the third party was made possible by the failure of the innkeeper (landlord) to

3. The *Tedder* opinion contains an excellent summary of the development of tort liability in this area. *See* 728 S.W.2d at 346–47. At common law, a lease was considered the equivalent of a sale of the premises for a term, and therefore the landlord was, as any seller would have been, relieved of liability for harm to the tenant once the property was turned over to the tenant. This rule worked well in a largely agrarian society, where agricultural property was the focus of the leasehold, and a residence on the leased property was considered merely incidental to the contract. Gradually, however, the law recognized that more modern residential leaseholds create a different relationship between the tenant and the landlord, who frequently retains a measure of control over the leased premises even beyond the so-called "common areas" of a multi-unit property. Modern lease agreements, for example, often place upon the landlord a continuing responsibility for maintenance and repairs, and for this purpose (as well as others) on-site managers commonly retain possession of a passkey to the leased premises. To the extent that the landlord retains such control, the cases almost unanimously hold that the landlord owes a duty of care to guard against increased risk of harm to the tenant by use of reasonable security precautions. *See generally* Annot., *Landlord's Obligation to Protect Tenant Against Criminal Activities of Third Persons*, 43 A.L.R.3d 331 (1972).

exercise reasonable care under the circumstances."

*Id.* (quoting *Zang v. Leonard*, 643 S.W.2d 657, 664 (Tenn.App.1982)). Continuing, the *Tedder* court said:

We do not perceive this extension of the common law as placing an undue burden on landlords. As in other negligence actions, the plaintiff will have to prove that the landlord was on notice of an unreasonable risk or likelihood of danger to his tenants caused by a condition within his control. Once notice sufficient to cause a reasonably prudent person to foresee the probability of harm is received, the duty to act arises and the failure to take reasonable steps to correct the problem within a reasonable time is a breach of that duty.

However, the plaintiff must further prove that the landlord's failure to act was the proximate cause of the injury. To meet this burden, the plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the landlord's power more probably than not would have prevented the injury.... If the injury was not reasonably foreseeable, then the criminal act of the third party would be a superseding, intervening cause of the harm, relieving the landlord of liability.

*Id.* at 348–49.

Ultimately, the Court of Appeals held that plaintiff Pauline Tedder had failed to establish a duty on the part of the landlord, because the proof failed to establish notice, either actual or constructive, of a dangerous condition over which the landlord had control—specifically, that one of the tenants was dealing in drugs. The court also held that "a bullet fired during a struggle with a burglar going through a wall and injuring a person in the apartment next door is [not] a probable, ordinary, natural, or usual result of drug dealing" and that the injury to young Scotty Tedder was, therefore, not reasonably foreseeable. *Id.* at 350.

Although the plaintiffs in *Tedder* were not successful in getting their case to the jury, the decision nevertheless marks an important departure from the general rule of nonliability that prevailed in the landlord's favor under the common law. That path has been followed almost universally by the courts which have been asked to decide similar issues over the course of the last 20 years. Many have relied on *Kline* and its control analysis. Others have looked in addition to the formulation of the rule in the Restatement (Second) of Torts as a foundation for finding a landlord liable to a tenant for the criminal acts of another. In Section 323(a), the Restatement provides:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if ... his failure to exercise such care increases the risk of such harm.

Restatement (Second) of Torts § 323(a) (1965).

Thus, in *Lay v. Dworman*, 732 P.2d 455 (Okla.1986), the Oklahoma Supreme Court was faced with a case in which a tenant was attacked in her apartment after notifying the landlord that the lock on her sliding glass door was defective. The landlord failed to act, despite knowledge of other assaults in the complex, and as a result an intruder gained access to the plaintiff's apartment and raped her. Invoking both *Kline* and § 323(a), the Oklahoma court said:

Aside from the duty of the landlord arising from traditional principles relating to the duty to maintain common areas of the premises, this case also requires consideration of the landlord's duty to maintain the actual security of the leased premises themselves.... [B]y retaining control over aspects of the premises such as door and window locks or alarm devices which directly relate to security, the landlord faces potential liability when the circumstances are such that a reasonable man would realize that a failure to

act would render one relying on those actions susceptible to criminal acts.

*Id.* at 458–59. *See also Rowe v. State Bank of Lombard,* 125 Ill.2d 203, 126 Ill. Dec. 519, 526, 531 N.E.2d 1358, 1365 (1988).

The majority opinion treats the development of landlord-tenant law in this area dismissively, as irrelevant to the situation in this case, which did not, obviously, involve a true landlord-tenant relationship. But, just as obviously, the principles of liability applicable to a landlord are likewise applicable to the defendants in this case, to the extent that they exercised the function of a landlord in retaining both access to the plaintiff's residence and control of its security through possession of a duplicate key. *Cf. Francis T. v. Village Green Owners Ass'n.,* 42 Cal.3d 490, 229 Cal.Rptr. 456, 723 P.2d 573, 576 (1986) (condominium association "owed plaintiff the same duty of care as would a landlord in the traditional landlord-tenant relationship," where plaintiff, raped by intruder, alleged that association had provided inadequate security measures); *see also Czerwinski v. Sunrise Point Condominium,* 540 So.2d 199 (Fla.App.1989), and other cases collected at Annot., *Condominium Associations' Liability to Unit Owner for Injuries Caused by Third Person's Criminal Conduct,* 59 A.L.R.4th 489 (1988).

Research suggests that the facts in this record are unique among reported cases. Nevertheless, it is clear that because of the defendants' possession of the duplicate key to the plaintiff's house, the parties had a "special relationship" of the kind contemplated in *Cornpropst,* even if that "special relationship" does not fall into the categories specifically mentioned in that case. Moreover, there is evidence from which a jury could find that the defendants knew (or reasonably should have known) that unauthorized but unforced entries had been made into various residences at Idlewild Court, under circumstances suggesting the wrongful use of a key.

It might be argued that the consequences of these unauthorized entries were relatively minor. There is no indication in the record, with one exception, of any great degree of property damage or loss, nor did the incidents result in the sort of violence against the person described in *Kline.* But the fact that the prior unauthorized entries at Idlewild Court did not result in personal injury or substantial property damage does not mean that they could be overlooked. If a landlord knows that crimes have occurred on the premises, the rule in *Tedder* requires that the landlord undertake whatever measures are reasonably necessary to avoid further such harm to tenants. If those prior crimes are serious ones, the landlord might be called upon to post a guard, increase the lighting in common areas, or install additional security devices. How much the landlord would be expected to do would depend entirely on the extent of the risk involved.

Here, we are concerned not with the landlord's duty to make common areas relatively safe for tenants, or even to provide adequate security measures for individual residences. Those security measures, in the form of deadbolt locks, had already been provided to Idlewild homeowners. But a deadbolt lock is only as good as the key to it is secure. Obviously, if the key to a lock falls into the wrong hands, the security of the residence itself is compromised.

Hence, when the question is one of wrongful use of a house key, even a relatively minor breach of security takes on major significance, because it demonstrates the fact that the lock (and therefore the residence) is not secure. Clearly then, it does not take a rape or robbery to trigger the duty of one in possession of a passkey or duplicate key to investigate instances of unauthorized entry and to take adequate precautions against future breaches of security. Even incidents as minor as those reported in this case—use of a toilet or theft of a can of tuna fish—are sufficient to put those in control of the keys on notice that some reasonable response on their part is required. When no response is forthcoming and an injury results from the very risk that the person in control should have taken steps to avoid, it is clear that the person guilty of failing to take action

should pay for the damages, and not the injured plaintiff.

This proposition of law is fully consistent with the Restatement rule of § 323(a). Indeed, the negligent handling of passkeys, as well as the failure to provide adequate locks and to maintain proper security in general, is now widely recognized as creating liability for injuries to a tenant caused by third persons. Only a cursory summary of these cases is necessary to make this point. Almost all of them rest on the principle, emphasized in the foregoing discussion, that if a landlord retains control of a portion of premises leased to a tenant, the landlord has a duty, as the party in control, to use reasonable care in exercising that control. This "control" clearly extends to the possession of passkeys, master keys, and duplicate keys.

For example, in *Rowe v. State Bank of Lombard*, 125 Ill.2d 203, 126 Ill.Dec. 519, 531 N.E.2d 1358 (1988), the injured plaintiffs were two women tenants in an office park who were attacked (one was killed) by a man previously employed on the premises as a construction worker. He had gained access by means of a passkey he had purloined while working on the site. The Illinois Supreme Court held that even in the absence of a general obligation to protect tenants under all circumstances, "[a] landlord may be held liable for the criminal acts of third parties when it 'voluntarily undertakes to provide security measures, but performs the undertaking negligently, if the negligence is the proximate cause of injury to the plaintiff.'" *Id.* 126 Ill.Dec. at 526, 531 N.E.2d at 1365 (citing Restatement (Second) of Torts § 324(a) (1965)). The court went on to hold that the operator of an office park, by retaining access to individual units through master keys, "assumed a duty to take reasonable precautions to prevent unauthorized entries by individuals possessing those keys," to account for all outstanding keys, and "to take preventive measures to ensure that individuals who were given keys would not make unlawful use of them." *Id.* at 528, 531 N.E.2d at 1367. The court was particularly critical of the fact that once the defendants knew that one or more keys were "out-

standing and unaccounted for," thus creating a risk of improper use, they nevertheless failed "to warn those rightfully on the premises of the danger or to take reasonable precautions to prevent foreseeable unauthorized entries by those with a master or grand master key." *Id.* at 529, 531 N.E.2d at 1368.

In *Center Management Corp. v. Bowman*, 526 N.E.2d 228, 230–1 (Ind.App.1988), a tenant was permitted to recover for thefts from her apartment that were committed without any sign of forced entry, from which fact the court deduced that "a key must have been used." An employee of the landlord testified "that all maintenance workers had access to master keys," and the court took special note of police testimony that "other burglaries absent signs of forced entry had [previously] occurred at the apartment complex." *Id.* at 231. The court noted that "the common-law rule that a landlord is not under a duty to protect a tenant from loss or injury due to criminal conduct by a third party" has been abrogated by recent decisions in various jurisdictions, and the court adopted a new rule, which it characterized as a "practical method" for determining the existence of a duty by a landlord under such circumstances:

> [There are] three considerations for determining whether a duty would exist: 1) the foreseeability of the injury, 2) the magnitude of the burden of guarding against the injury, and 3) the consequences of placing that burden upon the defendant.

*Id.* at 230, (citing *Morgan v. Dalton Management Co.*, 117 Ill.App.3d 815, 73 Ill.Dec. 313, 316, 454 N.E.2d 57, 60 (1983)).

Applying this rule to the facts, the Indiana court held that once the landlord has been put on notice by prior incidents involving unauthorized entry by probable use of a key, a duty arises to prevent further such conduct. Rejecting the defendants' contention "that the consequences and magnitude of the burden to guard against another such occurrence were prohibitive" and "that terminating their employees' use of the master keys would com-

pletely disrupt if not halt their system of maintenance and repairs," the court said that such contentions "ignore the possibility that access to the master keys could be greatly *restricted* and *monitored* for the protection of the tenants." *Id.* (emphasis added). The court allowed recovery by the plaintiff, based on the defendants' breach of duty to maintain adequate security of the keys, which it held to be the proximate cause of the theft of the plaintiff's property. *Id.*

In perhaps the most succinct statement of the rule, in a case involving a painter who had been employed by the landlord and who later entered the tenant's apartment and strangled her, the United States Court of Appeals for the District of Columbia Circuit said:

> [The tenant] had one set of keys for herself; another set was retained by the landlord. She was entitled to assume that the appellees would introduce no intruder into her apartment. She had a right to expect that the landlord would not give up his set of keys to a stranger or *so negligently fail to guard them that they might fall into the hands of one bent on mischief.*

*Kendall v. Gore Properties*, 236 F.2d at 678 (emphasis added).

There are numerous other cases involving negligent handling of keys. Naturally, some bear a closer resemblance to the facts of the case now before us than do others.[4]

Several of them deal with attacks on tenants by employees of the landlord, rather than by strangers. In *Advance Rental Centers, Inc. v. Brown*, 729 S.W.2d 644 (Mo.App.1987), the court recognized that there is no generalized "good Samaritan rule" creating a duty to protect against the criminal conduct of unknown third persons. But, the Court said,

> ... there are situations in which one might reasonably anticipate a danger from intentional or criminal misconduct because *he has brought the victim into contact or association with a person or persons whom he knows or should know to be particularly liable to commit criminal acts,* and *under circumstances which afford a peculiar opportunity or temptation for such misconduct.*
>
> * * * * * *

The duty described above arises where "special relationships" or "special circumstances" exist such that an act or omission exposes someone to an unreasonable risk of harm through the conduct of another....

"Special relationships" include those in which a party entrusts himself to the protection of another and relies on that person to provide a place of safety. Such relationships are usually delineated as those of innkeeper-guest, common car-

4. *See, e.g., Smith v. General Apartment Co.,* 133 Ga.App. 927, 213 S.E.2d 74 (Ct.App.1975), in which summary judgment for the defendant was held improper in an action brought by a female tenant who had been raped when an intruder gained access to her apartment with a passkey, where the landlord had failed to warn female tenants or take adequate steps to avoid injury to them, even though he knew that other such incidents had occurred on the premises. *Prager v. City of New York Housing Authority,* 112 Misc.2d 1034, 447 N.Y.S.2d 1013 (Civ.Ct. 1982) (landlord who provides "lock-out service" for tenants must "perform such services with prudent and reasonable precautions, so as to protect the subject premises and prevent the entry of trespassers and vandals"); *Miller v. State,* 62 N.Y.2d 506, 467 N.E.2d 493, 478 N.Y.S.2d 829 (1984) (where there had been reports of men in unauthorized areas of a women's dormitory, and there was thus "a reasonably foreseeable likelihood of criminal intrusion into the building," as operator of the housing, the state was negligent in failing to keep the outer doors locked and was therefore liable for injuries suffered when a student was raped in the laundry room of the dormitory; in this capacity, the state "is held to the same duty as private landlords in the maintenance of physical security devices in the building...."). *Trentacost v. Brussel,* 82 N.J. 214, 412 A.2d 436 (1980) ("jury could readily view the absence of a lock on the front entrance—an area outside an individual tenant's control—as exemplifying a callous disregard for the residents' safety in violation of ordinary standards of care"); *Jacobs v. Helmsley–Spear, Inc.,* 121 Misc.2d 910, 469 N.Y.S.2d 555 (Civ.Ct.1983) (landlord who voluntarily installed an electronic security device on the garage door and thereby "lulled [the tenant] into a false sense of security," was required to use reasonable care in maintaining the lock; failure to repair the malfunctioning device for eight days, at the end of which period the plaintiff was attacked and robbed by an assailant lurking inside the garage, constituted a breach of duty).

rier-passenger, school-student, and sometimes employer-employee....

"Special circumstances" include those in which *a known dangerous or violent individual is present* or where an individual present has conducted himself so as to indicate danger, and sufficient time exists to prevent injury....

*Id.* at 645, 646 (emphasis added). *See also Williams v. Feather Sound, Inc.,* 386 So.2d 1238 (Fla.App.1980) (higher standard of care imposed on landlord who provides employee with "access to the townhouse passkeys"); *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907 (Minn.1983) (involving rape of tenant by manager of apartment complex who gained access to the plaintiff's residence by means of a passkey).

Based on all of the foregoing authority, one is led inexorably to the conclusion that as a matter of law, the defendants in this case, having retained a duplicate key to the plaintiff's home, ostensibly in order to make necessary repairs, and thus having voluntarily exercised a measure of control over the security of her premises, were under a duty to exercise reasonable care in the handling of the key in order to avoid harm to the plaintiff by third persons, including their own employees. In the end, what distinguishes this case from *Cornpropst,* and thus makes the narrow holding of *Cornpropst* inapplicable to the situation here, is the fact that this case clearly involves misfeasance, rather than the mere nonfeasance involved in *Cornpropst.* To the extent that he found to the contrary, the trial judge was simply wrong in his analysis.

The case also differs from *Cornpropst* in terms of the foreseeability of the risk involved and the defendants' resulting duty to take steps to avoid that risk. Foreseeability is treated as a separate issue in the next section of this opinion because of its major relevance in this case to the question of proximate cause. But foreseeability is also relevant to the issue of duty, of which it is an important component. Under Tennessee law, if the injury to the plaintiff could not have been foreseen or anticipated by the defendant, then no duty of care arises and negligence cannot be established, as a matter of law. *Spivey v. St. Thomas Hospital,* 31 Tenn.App. 12, 27, 211 S.W.2d 450, 456 (1948). But, "the *particular harm* which actually befell [the plaintiff] *need not have been foreseeable." Id.* at 28, 211 S.W.2d at 457 (emphasis added). "[I]f the defendant could have foreseen that *some such harm* of like general character might result to plaintiff from the defendant's acts, and that injury was within the reasonable range of the risk created by such acts, a duty exists." *Lancaster v. Montesi,* 216 Tenn. 50, 56, 390 S.W.2d 217, 220 (1965) (emphasis added); *see also Coatney v. Southwest Tenn. Elec. Membership Corp.,* 40 Tenn.App. 541, 549, 292 S.W.2d 420, 424 (Tenn.App.1956) ("While it may be true that the particular accident which resulted in the death involved in the instant case may not have been foreseeable as such, we must remember that the particular harm which actually did occur, need not have been specifically foreseeable, in order to make the defendant liable").

Thus, awareness of prior incidents of unauthorized entry and thefts such as those at Idlewild Court may create a duty to avoid a foreseeable risk of harm. Under the rule followed by the great majority of courts, there is no requirement that the prior incidents be of the same kind or degree as the activity under review. Moreover, the reasonableness of the measures taken to avoid that harm will depend upon the circumstances of each case. *Francis T. v. Village Green Owners Ass'n,* 723 P.2d at 577–579.

In this case, a reasonable response by the defendant to avoid the risk presented could have taken any one of several forms. Certainly a jury could find that from the time the defendants (or any one of them) knew of the prior incidents of unauthorized but unforced entry, they were under an obligation to investigate the circumstances of those entries, to locate and restrict the use of any outstanding passkeys or duplicate keys, and to secure and monitor the duplicate keys located in the model home, that is, to lock them up and permit their use only on a carefully controlled basis.

Keys that were no longer needed could have been returned to the owners. Moreover, residents could have been warned about the possibility of unauthorized entries, based on those that had already occurred. Forewarned, Jane Doe might have demanded possession of her key, as one of her neighbors did, or she might have taken additional steps to increase her security.

In any event, the burden on the defendants to prevent the plaintiff's injury would have been slight. As one of the rapists indicated in his deposition, if the box of keys or the closet in the model home had been locked on the night in question, the rape would never have occurred. It is true, of course, that a rape is not necessarily the result in every case of negligent handling of keys. But, as one court has noted, the low probability of a crime actually occurring must be balanced against the magnitude of the potential harm involved, in order to determine whether or not inaction under the circumstances was reasonable. *See generally Samson v. Saginaw Professional Bldg., Inc.*, 393 Mich. 393, 224 N.W.2d 843 (1975). If the risk involves death or serious bodily injury to a number of persons, the law requires that some care must be exercised even though the probability is slight that the incident will occur. *Id.*, 224 N.W.2d at 849.

Hence, I come to the inescapable conclusion that in this case, based on the evidence in the record, there was sufficient proof to submit the issue of the defendants' breach of duty to a jury.

### 4. *Foreseeability as an Element of Proximate Cause.*

In speaking of causation, two of the country's leading authorities on negligence have noted that "[t]here is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser and Keeton, *The Law of Torts* § 41 (5th ed. 1984).

The law of Tennessee, like that of most jurisdictions, recognizes that in determining the existence of proximate cause, a criminal attack is generally held to constitute an intervening act. Such an intervening act will not relieve the defendant of liability, however, if it was reasonably foreseeable. *Evridge v. Am. Honda Motor Co., Inc.*, 685 S.W.2d 632, 635 (Tenn.1985); *Glenn v. Conner*, 533 S.W.2d 297, 301 (Tenn.1976). Foreseeability, of course, is ordinarily a jury question, and, thus, unless the alleged criminal act was unforeseeable as a matter of law, summary judgment in the defendants' favor is improper. *Evridge*, 685 S.W.2d at 636.

This Court's most recent discussion involving an intervening criminal act is found in *McClenahan v. Cooley*, 806 S.W.2d 767, 769 (Tenn.1991), in which we held that "[the] jury should be permitted to determine the issue of proximate causation in cases where the keys are left in the ignition of a parked automobile that is subsequently stolen and thereafter involved in an accident." Obviously there is a close analogy, if not a clear parallel, between negligence in the handling of a car key, followed by theft of the car and resulting injury to an innocent plaintiff, as occurred in *McClenahan*, and negligence in the handling of a house key, followed by a burglary and resulting injury to the innocent plaintiff, as occurred in this case. Other courts that have held landlords liable to tenants for crimes committed by third persons have relied on their own *McClenahan*-type cases as authority. *See, e.g., Paterson v. Deeb*, 472 So.2d 1210, 1218 (Fla.App.1985); *Kline* 439 F.2d at 484.[5]

---

5. In discussing the criminal acts of a third party as an intervening cause, Dean Prosser cites what he describes as the "best example" available to illustrate foreseeability. It is the case in which "the plaintiff is run down and injured by a thief *who has stolen the car and is making a getaway.*" Prosser and Keeton, *supra*, at § 44. Prosser notes that most jurisdictions have refused to hold the defendant liable under such circumstances and frames the dispositive question this way: "Leaving a car [with the key in the ignition] certainly creates a foreseeable likelihood that it will be stolen, which endangers the interests of the owner; but is it so likely that the thief, getting away, will drive negligently, that there any unreasonable risk of harm to anyone else?" *Id.*

Prosser indicates that most jurisdictions which have addressed this question have an-

In *McClenahan,* we set out the general test for determining the existence of proximate cause, as follows:

Taken as a whole, our cases suggest a three-pronged test for proximate causation: (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person or ordinary intelligence and prudence.

The foreseeability requirement is not so strict as to require the tortfeasor to foresee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. 'The fact that an accident may be freakish does not *per se* make it unpredictable or unforeseen.' *City of Elizabethton v. Sluder,* 534 S.W.2d 115, 117 (Tenn.1976). It is sufficient that harm in the abstract could reasonably be foreseen. Finally, proximate causation is a jury question unless the uncontroverted facts and inferences to be drawn from them make it so clear that all reasonable persons must agree on the proper outcome.

*McClenahan,* 806 S.W.2d at 775 (other citations omitted). Addressing the matter of the criminal act as an intervening cause, we said:

There is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result. An intervening act, which is a normal response created by negligence, is not a superseding, intervening cause so as to relieve the original wrongdoer of liability, provided the intervening act

could have reasonably been foreseen and the conduct was a substantial factor in bringing about the harm. 'An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated.'

*Id.* (quoting *Evridge v. American Honda Motor Co.,* 685 S.W.2d 632, 635 (1985) (citations omitted)). Finally, of prime importance on the question of the propriety of summary judgment in this case, we observed in *McClenahan:*

Just as in the case of proximate causation, the question of superseding intervening cause is a matter peculiarly for the jury because of foreseeability considerations.

\* \* \* \* \* \*

The basic issue is foreseeability, both as to proximate causation and superseding intervening cause, and that is a question of fact rather than of law upon which reasonable minds can and do differ. . . .

*Id.* at 775–76 (citations omitted).

As we did in *McClenahan,* courts in other jurisdictions have had little difficulty with the question of proximate cause under factual circumstances similar to those in the case now before us. For example, the Supreme Court of Florida has aptly framed the analysis of foreseeability in this context:

Another way of stating the question whether the intervening cause was foreseeable is to ask whether the harm that occurred was within the scope of the danger attributable to the defendants' negligent conduct. A person who creates a dangerous situation may be deemed negligent because he violates a duty of care. The dangerous situation so created may result in a particular type of harm. The question of whether the harm that occurs was within the scope of the risk created by the defendants' conduct may be answered in a number of

swered it in the negative. As the opinion in *McClenahan* indicates, however, Tennessee has

long responded in the affirmative.

ways. First, the legislature may specify the type of harm for which a tort-feasor is liable. Second, it may be shown that the particular defendant had actual knowledge that the same type of harm has resulted in the past from the same type of negligent conduct. Finally, there is the type of harm that has so frequently resulted from the same type of negligence that in the field of human experience the same *type* of result may be expected again.

*Gibson v. Avis Rent–A–Car Systems, Inc.*, 386 So.2d 520, 522 (Fla.1980) (citations omitted) (emphasis in original).

In *Paterson*, 472 So.2d 1210, the Florida Court of Appeals applied the analysis in *Gibson* to a case involving an unknown assailant's sexual attack on a tenant who lived in a building with a broken lock on the outside front door and no lock at all on its rear door, giving intruders access to common areas of the building. The *Paterson* court noted that there was not a sufficient statutory basis for liability and no indication of prior incidents of the same kind. The court "conclude[d], however, that the type harm suffered by the plaintiff in this case has so frequently resulted from the same type of negligence, to wit, not providing security locks on doors and windows to prevent unauthorized entry by criminals, that in the field of human experience the same type of harm may be expected again." *Id.* at 1218. Indeed, said the court:

> [W]here the duty breached by a landlord has as one of its principal purposes the prevention of entry by unauthorized persons, the deliberate act of such person in committing sexual battery upon a tenant does not constitute an "independent intervening cause" that cuts off the chain of legal causation and insulates the landlord from liability.

*Id.* (citations omitted) (emphasis added). And, the court added, "[w]here reasonable persons might differ, the ultimate determination of foreseeability and legal cause are questions for the jury." *Id. Accord Dawson v. Sears, Roebuck & Co.*, 217 Tenn. 72, 80, 394 S.W.2d 877, 881 (1965).

Likewise, in a case involving a former employee who gained possession of a passkey through the landlord's negligence, used it to gain entry to a building, and ultimately murdered someone inside the building, the Illinois Supreme Court noted:

> It is [the defendant's agents'] contention, however, that the appellate court correctly held that the criminal attack on [the plaintiffs] was unforeseeable, as a matter of .law, and therefore they did not owe a duty to guard against it. They say that although they might have had notice that master and grandmaster keys were outstanding, it was not foreseeable that an individual would use one and enter a tenant's office and assault those present, particularly in light of the fact that there had not been any violent crimes at the office park in the past.... [But] there were 17 incidents of criminal activity at the complex in the preceding two years. Though most were or involved minor thefts from the parking lot area, ... several of the incidents involved burglaries from offices where there were no signs of forced entry.... We consider that knowledge that master and grandmaster keys were outstanding and unaccounted for and that a number of burglaries were committed on the premises that showed no sign of forced entry raised a genuine issue of material fact as to whether a reasonable person should have foreseen ... the danger or risk of similar crimes in the future and would have taken reasonable precautions to guard against it....

*Rowe v. State Bank of Lombard*, 125 Ill.2d 203, 126 Ill.Dec. 519, 530, 531 N.E.2d 1358, 1369 (1988). The Illinois Supreme Court in *Rowe* then focused on the crux of the foreseeability question that is also presented in this case:

> The purpose of having secure locks is to prevent entries by intruders and the accompanying criminal conduct.

*Id.*, 531 N.E.2d at 1369 (emphasis added).

Judicial recognition that the commission of a criminal act such as theft, assault, or rape is the foreseeable result of a failure to maintain adequate security measures is re-

flected in many reported cases, most of them concerning negligence with regard to the handling of keys or the failure to provide locks on leased premises and in dormitories. *See, e.g., Razdan v. Parzen,* 157 Ga.App. 848, 278 S.E.2d 687 (1981); *Ponticas,* 331 N.W.2d 907; *Paterson,* 472 So.2d 1210; *Cutler v. Bd. of Regents of State of Fla.,* 459 So.2d 413 (Fla.App.1984); *Peterson v. San Francisco Community College Dist.,* 36 Cal.3d 799, 205 Cal.Rptr. 842, 685 P.2d 1193 (1984); *Mullins v. Pine Manor College,* 389 Mass. 47, 449 N.E.2d 331 (1983); *Fazzolari v. Portland School District,* 78 Ore.App. 608, 717 P.2d 1210 (1986), *affd,* 303 Or. 1, 734 P.2d 1326 (1987); *Miller v. State,* 62 N.Y.2d 506, 478 N.Y.S.2d 829, 467 N.E.2d 493 (1984). Other such cases are collected at Annot., *Landlord's Obligation to Protect Tenant Against Criminal Activities of Third Persons,* 43 A.L.R.3d 331 (1972).

In some of these cases, the courts were willing to conclude that the criminal attacks were foreseeable merely from the fact of lax security, but most involve a finding by the courts either that the premises were located in high crime area, making unauthorized entry and criminal attack foreseeable, *see e.g., Kline,* 439 F.2d 477, or that there had been prior incidents of crime in the area or on the premises, making further such activity foreseeable. *See, e.g., Francis T.,* 42 Cal.3d 490, 229 Cal. Rptr. 456, 723 P.2d 573 (1986). Moreover, the general rule is that knowledge of prior incidents is relevant to the issue of foreseeability of a later sexual assault even if the prior incidents involved lesser crimes, and even if those crimes were non-violent. *Czerwinski v. Sunrise Point Condominium,* 540 So.2d at 201; *Paterson,* 472 So.2d at 1218. Significant to the foreseeability question here, especially on the question of Elwood Carpenter's negligence in permitting Clinton Osborne to remain on the Idlewild Court premises, is the holding by one court that:

> The jury, as finder of fact, could have found, as it did, that it was reasonably foreseeable that a person with a history of offenses of violence could commit another violent crime, notwithstanding the history would not have shown him ever to have committed the particular type of offense.

*Ponticas,* 331 N.W.2d at 912.

In holding that the injuries suffered by the plaintiff in this case could not have been reasonably foreseen, the majority seems to be troubled, essentially, not by the question of foreseeability, as that question is commonly understood, but by the relative infrequency with which a rape can be expected to occur as the result of conduct such as that exhibited by the defendants in this case. It is true that a rape does not occur every time house keys are carelessly maintained or a door is left unlocked. But the fact that a rape does not result in every such case does not answer the question of foreseeability, as the cases discussed above illustrate. As the Florida Supreme Court noted in its opinion in *Gibson* 386 So.2d at 522, the test is whether the harm that results from the negligence shown is harm that can be expected "in the field of human experience" to happen. We commonly lock our doors and secure our premises to prevent unauthorized entries, and for no other reason, because in our "field of experience" we recognize the risk that intruders might steal our property or threaten our safety.

Hence, to resolve the question of foreseeability in this case, one need only ask why Jane Doe locked her door on the night in question. She obviously locked it to keep out criminal assailants such as Sam Carpenter and Clinton Osborne. *But for* the defendants' negligence, the security of her home would not have been breached, and she would not have been raped. To establish foreseeability, it is enough to show that the defendants knew or reasonably should have known that their conduct materially increased by risk of harm to the plaintiff in this regard. As previously noted, there is no requirement under Tennessee law that in order to be held liable, the defendants "must have [had] threatened specific criminal act by a specific person." *Zang v. Leonard,* 643 S.W.2d 657, 664 (Tenn.App.1982).

If the *sine qua non* of the determination of foreseeability is not solely the frequency or infrequency with which the injury in question occurs, what then is its distinguishing feature? There are, of course, many cases which attempt to define foreseeability. Beyond definition, perhaps a helpful way to address this question is to look at the cases in which courts have held that the events in question were *not* reasonably foreseeable.

*Tedder v. Raskin*, for example, involved a tenant who sought to hold her landlord liable in tort for injuries caused by a stray bullet that came through the wall of the plaintiff's apartment and struck her child as he lay sleeping in bed. The bullet had apparently been fired as the result of a struggle between the tenant in the next apartment and a man who was trying to rob him as the result of drug dealing between the two. Prior to the shooting, the plaintiff had complained to the apartment manager about congestion in the parking lot caused by a stream of people coming and going from the neighbor's apartment, and she had suggested to the manager that there might be drug dealing going on there. However, there were no reports of any sort of criminal offense on the premises, either major or minor, that would otherwise have put the landlord on notice of increased risk to the tenants. The Tennessee Court of Appeals held that the plaintiff's comment to the landlord was mere speculation and that she had failed to produce material evidence that the injury was "a reasonably foreseeable and probable result of the landlord's negligence." *Id.* at 350. The court determined that "a bullet fired during a struggle with a burglar going through a wall and injuring a person in the apartment next door is [not] a probable, ordinary, natural, or usual result of drug dealing," and is thus not foreseeable. *Id.*

Likewise, a California court has held that injuries resulting from a gun fight between unknown persons in a laundry room in an apartment building could not be reasonably anticipated. *Totten v. More Oakland Residential Housing, Inc.*, 63 Cal.App.3rd 538, 134 Cal.Rptr. 29 (1976). Another court ruled that a heart attack induced by the throwing of a can of paint from the balcony of an apartment building down upon the plaintiff was not reasonably foreseeable. *Gulf Reston, Inc. v. Rogers*, 215 Va. 155, 207 S.E.2d 841 (1974).

The outcome of these cases is not surprising. However, my research has failed to reveal a recent reported opinion in which a court has been willing to say that sexual assault on a tenant is not reasonably foreseeable as a result of a landlord's lack of due care with regard to security. To the extent that the defendants in this case stood in the shoes of a landlord vis à vis their relationship to the plaintiff, the same result should pertain.

Based upon Tennessee case law, as well as persuasive authority from other jurisdictions, it seems clear beyond dispute that a jury could find foreseeability in this case. As noted above, the Tennessee courts have, for some time now, recognized that it is reasonably foreseeable that negligently leaving a key in the ignition of an unlocked car will result in injury or property damage to some other person, many miles away, at the hands of the thief who steals the car. But the likelihood of such an event occurring is no more or less foreseeable than the risk of personal injury or property damage resulting from negligence in connection with the key to a person's residence. The law encourages us to handle car keys with care, so that no one will steal a car and cause injury. House keys must be handled with the same care, so that no one will intrude and cause injury. The potential for harm to persons and property is equally apparent in either case. If the result of negligence with regard to car keys is reasonably foreseeable, so is the result of negligence with regard to house keys. And, the same conclusion inexorably follows in both instances: the jury should be given the opportunity to judge the facts and to assess liability.

### 5. *Conclusion.*

On the surface, this case raises ordinary negligence issues that can be resolved by the use of ordinary rules of tort law. However, it has a larger significance in that it

presents this Court with its first opportunity since the *Cornpropst* decision in 1975 to look at the question of a defendant's liability for negligence that results in injury to the plaintiff from criminal acts committed by third persons. The relationship in this case between the parties (and, for that matter, among the parties and the criminal perpetrators) differs significantly from that in *Cornpropst*. Moreover, we now have the advantage of more than 15 years of development in this area of the law, both inside and outside Tennessee. That development has been, to say the least, dramatic—in the words of one commentator, it has been revolutionary.

If this case is swept aside on the basis of summary judgment, we will have lost a valuable opportunity to benefit from the analysis developed by the many other courts that have addressed these issues in the two decades since *Kline*. The rulings in all these cases, as the Court of Appeals in *Tedder* noted, form a logical extension of the law and place no undue economic burden on the innkeeper, the common carrier, the landlord, or those, like the defendants here, who stand in the shoes of the landlord. In the words of one court:

> In approaching the problem authorities have recognized that the duty [of care to avoid an unreasonable risk of harm through the conduct of another] is not determined so much by the foreseeability of the criminal act, but whether one party is in a superior position to be aware of the danger and to take measures to guard against it. In the final analysis the matter is one of policy.

*Brown*, 729 S.W.2d at 646 (citations omitted). And, an even more recent decision includes this message:

> Although the foreseeability of a plaintiff's injury is important in the determination of whether a duty exists, the imposition of a duty does not depend upon foreseeability alone. As Dean Prosser stated, "[I]t should be recognized that 'duty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Whether a duty exists depends on a consideration of the likelihood of injury, the magnitude of the burden to guard against it, and the consequences of placing that burden upon the defendant.

*Rowe*, 531 N.E.2d at 1371–72 (citations omitted).

The Illinois Supreme Court's holding in *Rowe* is fully applicable to the circumstances in Jane Doe's case:

> Providing adequate security measures would have been relatively inexpensive.... The risk of unauthorized entry could also have been avoided by notifying those on the premises of the danger. In light of the risks [the defendants] created, it would not have been an insurmountable burden for [them] to assume.

*Id.*

We should hold in this case that summary judgment was inappropriate. Once the defendants voluntarily assumed possession of the duplicate key, undertook to provide repairs to Jane Doe's house, and permitted workmen to have access to the key and thus to the inside of her house to make those repairs, they owed Jane Doe a duty of reasonable care under the circumstances to protect against an increased risk of harm to her as the result of their actions. The questions of what care was reasonable, whether the defendants breached their duty of care, and whether the breach proximately caused the plaintiff's injury should have been submitted to a jury for determination.

I, therefore, dissent from the majority's ruling that the complaint in this case was properly dismissed on summary judgment.