IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
_____

MICHAEL C. GLEAVES,

      Plaintiff-Appellee,

Vs.

Davidson Circuit No. 95C-1706

C.A. No. 01A01-9710-CV-00577

CHECKER CAB TRANSIT
CORPORATION, INC.,

      Defendant-Appellant.

**FILED**

**September 14, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

FROM THE DAVIDSON COUNTY CIRCUIT COURT
THE HONORABLE HAMILTON V. GAYDEN, JR., JUDGE

William D. Leader, Jr., Melissa S. Herring,
Boult, Cummings, Conners & Berry, PLC of Nashville
For Appellee, Michael C. Gleaves

Steven D. Parman, Matthew A. Boyd,
Watkins, McGugin, McNeilly & Rowan, P.L.L.C., of Nashville
For Appellant

*REVERSED IN PART AND AFFIRMED IN PART*

Opinion filed:

**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

CONCUR:

ALAN E. HIGHERS, JUDGE

DAVID R. FARMER, JUDGE

      This case arises from an automobile accident involving a taxicab in which the taxicab

company was held liable for the negligence of the taxi driver. Defendant/Appellant Checker Cab

Transit Corporation appeals the judgment of the trial court on the jury verdict awarding plaintiff

$300,000.00 in compensatory damages.

Defendant/Appellant Checker Cab Transit Corporation (Checker Cab) is a provider of dispatching services to a group of independent taxicab owner-operators in the greater Nashville, Tennessee area. Checker Cab has nine employees who serve as dispatchers for approximately sixty taxis. Each taxi operator owns his or her own vehicle and pays a flat weekly fee to Checker Cab in exchange for dispatching services. In addition, Checker Cab provides each operator with Checker insignia, lights, radios, and fare meters. The arrangement between Checker Cab and the owner-operators is unusual in that Checker Cab claims to have no control over the hiring and firing of drivers.[1] The independent owner-operators meet periodically to elect members to a governing board composed of three members. The board, which is responsible for promulgating rules for the operation of Checker cabs, has the sole authority to admit new owner-members and must approve of all drivers who wish to work for, or in effect sublease, a taxicab from an owner-operator. In addition, the board acts on complaints against drivers and disciplines those who violate the rules. All Checker taxicabs operate under a single "Certificate of Public Convenience and Necessity" which Checker Cab obtained through the city of Nashville's Taxicab & Wrecker Licensing Board pursuant to the Code of the Metropolitan Government of Nashville and Davidson County (Nashville Metro Code) 6.72.020. The Nashville ordinances governing the operation of taxicabs include:

> Nashville Metro Code 6.72.210: Liability Insurance Agreement.
>
> A. All taxicab companies shall be required to file a liability insurance agreement with the taxicab and wrecker licensing board for each taxicab operated under their franchise. A copy of such agreement is on file, attached to Ordinance 81-530, codified in this section.
>
> B. These agreements shall place the vehicles operated under their franchise in the taxicab company's complete possession and control, and the taxicab company shall assume complete liability for each and every vehicle for which it enters into this agreement.

The Liability Insurance Agreement executed by Checker Cab requires that all vehicles operated under Checker Cab's Certificate of Public Convenience and Necessity be covered by

---

[1] Checker Cab analogizes the association of owner-operators to the Teamsters Union, suggesting that it is subject to the whims of the owners and that its only recourse for dealing with an errant driver is to request that the board take action. Furthermore, each owner-operator is free to hire relief drivers on his own, subject only to approval by the board of owners.

a policy of liability insurance that meets the minimum limits established by the State of Tennessee. The agreement also provides:

> 3. That the above-named taxicab company, partnership or sole proprietorship shall assume complete liability for each vehicle being operated under its name, color, emblem, design and insignia and shall be liable for any personal injuries or property damage to third parties as the result of the negligent use of this (these) vehicle(s).

Defendant Robert Mosley (Mosley) is an independent owner-operator affiliated with Checker Cab. Mosley is a manic-depressive with a history of erratic and violent behavior who must take lithium to control his emotions and behavior. Mosley was operating his taxi all day on April 7, 1995 until contacting the dispatcher and notifying her that he was going off-duty at 9:20 p.m. There is some dispute as to whether Mosley continued to pick up passengers after this time, but it is undisputed that Mosley was on his way home when the accident occurred. On his way home, Mosley, who was off his medication, passed a City of Lakewood police car at a high rate of speed. Officer Darin Kelley initiated pursuit and chased Mosley a distance of between four and five miles at speeds upwards of 90 mph. The chase ended abruptly when Mosley ran a red light and collided with Plaintiff/Appellee Michael Gleaves's (Gleaves) car at the intersection of Old Hickory Blvd. and Delaware Ave. Gleaves suffered severe injuries to his right leg and is permanently disabled as a result.

Plaintiff filed suit against Mosley, Checker Cab, the City of Lakewood, and Officer Darin Kelley seeking $600,000.00 in compensatory damages. Plaintiff alleged, *inter alia*, that Checker Cab was liable to plaintiff on a theory of *respondeat superior,* that plaintiff was negligent in its hiring, supervision, and licensing of defendant, and that Checker Cab was liable for plaintiff's injuries pursuant to the Taxicab Liability Insurance Agreement and the provisions of the Nashville Metro Code cited above. In its answer, Checker Cab denied that Mosley was an employee or agent of Checker Cab and asserted that because Mosley's vehicle was not being operated as a taxicab at the time of the collision, there was no liability under the Nashville ordinances.

The trial court granted summary judgment to Checker Cab "on the issues of respondeat superior, agency, negligent hiring, negligent supervision, and § 317 of the Restatement (Second) of Torts (1964)." In addition, the trial court, *sua sponte*, granted "summary judgment to [plaintiff] against Checker Cab for damages resulting from Mosley's negligence pursuant to

3

Metropolitan Government Code §§ 6.72.010 through 6.72.440." The case proceeded to trial by jury. At the close of all proof, the court directed a verdict in favor of Officer Kelley and dismissed him as a party. The jury returned a verdict in favor of plaintiff and awarded compensatory damages in the amount of $300,000.00. The jury apportioned seventy (70%) percent fault to Mosley and thirty (30%) percent fault to the City of Lakewood. Pursuant to the trial court's prior grant of summary judgment, the trial court ordered that Checker Cab was jointly responsible for Mosley's $210,000.00 share of the judgment.

Checker Cab appeals the judgment of the trial court, asserting that it was error to grant summary judgment to plaintiff against Checker Cab and hold it liable for the negligence of Mosley pursuant to the Nashville ordinances governing the operation of taxicabs. Checker Cab asserts that the intent of the ordinances was not to impose liability upon the holder of a Certificate of Public Convenience and Necessity for every act of drivers operating thereunder, but merely to "(1) ensure that minimum levels of liability insurance are in place while a taxicab is operating on the streets of Nashville, and (2) provide incentive to the holders of a Certificate of Public Convenience and Necessity to assist in the procurement of such insurance by imposing liability on them while a taxicab is being operated under their franchise." Gleaves requests that in the event this Court reverses the trial court on this issue, that we reconsider the propriety of the trial court's dismissal of his other causes of action.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *Id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

4

*Id.* at 211 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

The extent of the liability created by the Nashville ordinances is purely a question of statutory interpretation. This Court must construe a municipal ordinance using the same rules of construction applied to statutes. *Tennessee Manuf. Hous. Ass'n v. Metropolitan Gov't of Nashville*, 798 S.W.2d 254 (Tenn. App. 1990). When interpreting a statute or ordinance, the role of the Court is to "ascertain and give effect to the legislative intent." *Sharp v. Richardson*, 937 S.W.2d 846, 850 (Tenn. 1996). To this end, the meaning of a statute is not to be determined from special words in a single sentence or section, but from the statute taken as a whole. *State ex rel. Bastnagel v. City of Memphis*, 224 Tenn. 514, 457 S.W.2d 532 (1970). In the absence of ambiguity, legislative intent is derived from the face of a statute, and the Court may not depart from the "natural and ordinary" meaning of the statute's language. *Davis v. Reagan*, 951 S.W.2d 766, 768 (Tenn. 1997); *Westland West Community Ass'n v. Knox County*, 948 S.W.2d 281, 283 (Tenn. 1997). However, it is also presumed that in enacting the statute the legislature did not intend an absurdity. *Epstein v. State*, 211 Tenn. 633, 366 S.W.2d 914 (1963). To avoid an absurd result, the obvious intention of the law must prevail over the literal sense of the words. *Byrd v. Pioneer-Jellico Coal Co.*, 180 Tenn. 396, 175 S.W.2d 542 (1944).

Gleaves asserts that the ordinances are unambiguous and impose complete liability upon the holder of the Certificate of Public Convenience and Necessity, in this case Checker Cab, whether or not the negligent acts complained of occurred on or off duty. In response, Checker Cab asserts that the ordinances create liability only when the taxicab is "operated under [the Cab company's] franchise" and that the independently owned vehicles are only so operated when the drivers are actually on duty and either carrying or soliciting passengers. A cursory review of the selected provisions could lead to either conclusion. However, since we do not have the benefit

5

of legislative history to assist in determining the intent of the drafters, this Court must look to the ordinance as a whole to determine the extent of liability intended. If we were to hold as the plaintiff urges, and as did the trial court, the ordinance would place liability upon Checker Cab in derogation of the common law[2], therefore, the ordinance must be strictly construed. ***Perry v. Sentry Ins. Co.,*** 938 S.W.2d 404 (Tenn. 1996).

Upon review of the entire chapter of the Nashville Metro Code[3] governing the operation of taxicabs, we find several provisions that are inconsistent with the plaintiff's construction. The ordinance defines a taxicab as "a motor vehicle regularly engaged in the business of carrying passengers for hire, donation, gratuity or any other form of remuneration, having a seating capacity of less than ten persons and not operated on a fixed route." Nashville Metro Code 6.72.010. We read this to mean that a vehicle "regularly engaged in the business of carrying passengers for hire" is a "taxicab" twenty-four hours per day, whether or not passengers are being carried or solicited. This interpretation is bolstered by section 6.72.110 which provides that "[n]o person shall operate a taxicab *for hire* upon the streets and roads of the metropolitan government . . . unless the driver of such taxicab shall first obtain . . . a taxicab driver's permit." (emphasis added). The inclusion of the phrase "for hire" implies that a taxicab may be operated around town on personal business, or by one who is not a licensed taxicab driver, such as the spouse of the owner for example, provided that paying passengers are not carried or sought. Indeed, no party to this lawsuit has questioned either the right of an owner to use his or her vehicle for personal business, or the right to allow another to use the vehicle for personal business. However, if we interpret the ordinances literally, as plaintiff would have us do, then any personal use of the vehicle would be prohibited by section 6.72.430, which provides that "[n]o taxicab driver shall . . . use his vehicle for any purpose other than the transporting of fare-paying passengers." Furthermore, Checker Cab has contracts with approximately 150 Nashville area businesses for the delivery of packages. Did the drafters intend for this to be a prohibited

---

[2] Plaintiff's construction of the ordinances would essentially place strict liability on the holder of a Certificate of Public Necessity and Convenience. Without benefit of the ordinance, in order to hold Checker Cab vicariously liable for the negligence of a taxi driver, plaintiff would have to show that the driver was acting in the course and scope of employment when the alleged negligent act occurred. See discussion of *respondeat superior infra.*

[3] Attached as an addendum to this opinion are parts of the ordinance pertinent to the issues under consideration.

activity? We think not. The question we face is whether the drafters intended to extend liability twenty-four hours per day, no matter who is operating the vehicle, or for what purpose.

Also enlightening is section 6.72.370 of the Code which provides: "The driver of any taxicab shall remain in the driver's compartment or immediately adjacent to his vehicle at all times when such vehicle is on the public streets; except that, when necessary, a driver may be absent from his taxicab for not more than ten consecutive minutes." The language "at all times" is certainly very broad, and arguably encompasses every moment a taxicab is upon the public streets. However, by no stretch of the imagination can we believe that the drafters meant this literally. Certainly, the drafters did not intend to require that an off-duty driver remain adjacent to the vehicle when it is parked on the street in front of his or her home for the night. The only logical construction of this provision is that it only applies when the taxicab is being operated for hire.

There is another anomaly that we find persuasive. By signing the liability insurance agreement, Checker Cab "assumed complete liability for each vehicle being operated under its name, color, emblem, design and insignia and shall be liable for any personal injuries or property damage to third parties as the result of the negligent use of this (these) vehicle(s)." Gleaves asserts that this provision unambiguously places complete liability upon Checker Cab without regard to whether paying passengers are being carried or sought. Checker Cab asserts that the vehicles are "operated under" the name, color, emblem and insignia of Checker Cab only when they are carrying passengers for hire, or are available to do so. If we were to adopt Gleaves's interpretation of this language, Checker Cab would arguably be liable if a taxicab were stolen and a traffic accident ensued while the thief was making his get away. We do not believe that the drafters intended to create such sweeping liability.

These examples lend credence to Checker Cab's assertion that despite the broad sweeping language used, the ordinances governing taxicabs were intended to apply only when the vehicles are operated for hire. We think this is the only rational conclusion. *Cf. Farrell v. Greater Houston Transp. Co.*, 908 S.W.2d 1 (Tex. App. 1995) (holding that a Houston municipal ordinance making a Cab company "responsible for anyone operating under [its] permit" was not intended to make the taxicab company strictly liable for the torts of its drivers).

From our review of the ordinance as a whole, we conclude that Checker Cab's liability under the ordinance is limited for those circumstances when a taxicab is operating under the franchise and carrying passengers or otherwise available for hire. Accordingly, the order of the trial court granting summary judgment in favor of plaintiff against Checker Cab on the issue of the liability created by the Nashville ordinances is reversed. However, this does not end our inquiry concerning Checker Cab's liability. We must now determine whether there is any genuine issue of material fact on the question of whether, at the time of Mosley's accident, the taxicab was operated under the franchise. This is essentially the appellee's issue presented for review of whether the trial court erred in granting Checker Cab summary on the theory of *respondeat superior*.

An employer is held vicariously liable for torts committed by its employees that are committed within the course and scope of their employment. ***Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co.***, 840 S.W.2d 933, 937 (Tenn. App. 1992). Thus, for an employer to be liable, the plaintiff bears the burden of proving three elements:

> (1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred.

***Id.*** Although this inquiry is generally a question of fact, it becomes a question of law "when the facts are undisputed and cannot support conflicting conclusions." ***Id.***; ***Smoot v. Marks***, 564 S.W.2d 231, 236 (Mo. App. 1978). Notwithstanding its finding that the issue of whether Mosley was an employee of Checker Cab is a "disputed jury question," the trial court ruled that resolution of the issue is irrelevant since the accident occurred outside the scope of Mosley's employment relationship with Checker Cab.

While it is not essential for Mosley to be an employee of Checker Cab in order to hold Checker Cab liable under the ordinance, it is essential that the taxicab be operated under the franchise, that is carrying passengers or available for hire. Such a determination would be analogous to a finding that driver Mosley was acting in the course and scope of his authority when the accident occurred.

The Restatement (Second) of Agency has been utilized by courts in this state as a

framework for determining whether an employee has acted within the course and scope of his or her employment. *Tennessee Farmers,* 840 S.W.2d at 937-38. Section 228 states as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master; and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1957). Section 229 states:

> (1) To be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
>
> (a) whether or not the act is one commonly done by such servants;
> (b) the time, place and purpose of the act;
> (c) the previous relations between the master and the servant;
> (d) the extent to which the business of the master is apportioned between different servants;
> (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
> (f) whether or not the master has reason to expect that such an act will be done;
> (g) the similarity in quality of the act done to the act authorized;
> (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
> (i) the extent of departure from the normal method of accomplishing an authorized result; and
> (j) whether or not the act is seriously criminal.

Restatement (Second) of Agency § 229 (1957); *see also Tennessee Farmers*, 840 S.W.2d at 938.

Gleaves asserts that there is some dispute concerning whether Mosley was working at the time of the accident. The record indicates that at 9:20 P.M. on the date of the accident, Mosley reported to the Checker Cab dispatcher that he was going off duty and stated that he was going home. Joe Rakes, another Checker Cab driver, testified that he was with Mosley at the Nashville International Airport shortly after Mosley had checked out with the dispatcher.

9

Gleaves contends that the following portion of Rakes's testimony indicates that Mosley may have been working even after he checked out with the dispatcher:

> Q.  It was after he checked out that you told him to go home?
>
> A.  Yeah.  Like I say, he was tying up the radio, running his mouth.
>
> Q.  You told Mr. Mosley to go home after he had checked out from the dispatcher?
>
> A.  Yes.
>
> Q.  It was after he had checked out with the dispatcher and he was off duty when you told him?
>
> A.  Yeah.  He was still out there running around and talking -- tying up that radio.  And Carol -- I don't know what her last name is now -- but either she told me or I talked to her back and forth about him and he shouldn't be out there working and running his mouth on that radio, as far as him getting on the radio and tying up the radio.
>
> Q.  And he was off duty at the time?
>
> A.  Yes.

Rakes, however, also testified as follows:

> Q.  Did you see him leave the airport?
>
> A.  Yes, sir.
>
> Q.  And where was he heading?
>
> A.  Going home.
>
> Q.  Did he say he was going home?
>
> A.  Yeah, because I told him if he didn't, the cab inspector or somebody would get him.  Somebody would say something about him and all that because he was -- wasn't working.  If a cab inspector sees you, they're liable to take your permit away from you again.
>
> Q.  Had he already clocked out that night?
>
> A.  Yeah.  I think he had.  Yeah.  He wasn't out there working. He was just talking to drivers.

Gleaves, nevertheless, notes evidence in the record indicating that Mosley may not have gone directly home from the airport and may have driven passengers to downtown Nashville.

Notwithstanding this testimony, there is no question that Mosley did not have passengers in his cab at the time of the accident.  There is also no evidence to dispute Mosley's testimony

that at the time of the accident, he was on his way home:

> All I remember is that I was going home. That's all I remember.
> You know, I told them I was going home, and I headed towards
> home.

Thus, even if there is a genuine issue of material fact concerning whether Mosley was working after he checked out with the dispatcher, the record supports the trial court's finding there is no genuine dispute that at the time of the accident he was not working and was traveling home.

Ordinarily, an employer is not vicariously liable for an employee's negligence while the employee is traveling to and from work. *Sharp v. Northwestern Nat. Ins. Co.*, 654 S.W.2d 391, 392 (Tenn. 1983). However, under certain circumstances an employer may be held vicariously liable under the "traveling men" exception. *Smith v. Royal Globe Ins. Co.*, 551 S.W.2d 679, 681 (Tenn. 1977). This exception was discussed in *Craig v. Gentry*, 792 S.W.2d 77 (Tenn. App. 1990):

> The test in brief is this: If the work of the employee creates the
> necessity for travel, he is in the course of his employment, though
> he is serving at the same time some purpose of his own.

*Id.* at 79 (quoting *Pratt v. Duck*, 28 Tenn. App. 502, 512, 191 S.W.2d 562, 566 (1945)); *see also Tennessee Farmers*, 840 S.W.2d at 938; Annotation, *Employer's Liability for Employee's Negligence in Operating Employer's Car in Going to or from Work or Meals*, 52 A.L.R. 2d 350 (1957). Applying this exception, courts have found employees to be acting within the scope of their employment during travel in instances in which travel was an essential element of the employment relationship. *See, e.g., Martin v. Free Service Tire Co.*, 189 Tenn. 327, 225 S.W.2d 249 (1949) (exception applied to account collector who was returning home after attempting to collect accounts in another city); *Carter v. Hodges*, 175 Tenn. 96, 132 S.W.2d 211 (1939) (exception applied to traveling salesman while staying at a hotel); *Employers' Liab. Assurance Corp. v. Warren*, 172 Tenn. 403, 112 S.W.2d 837 (1938) (exception applied to insurance adjuster while staying at a hotel). In *Sharp v. Northwestern National Insurance Co.*, 654 S.W.2d 391 (Tenn. 1983), the Court categorized these cases applying the "traveling men" exception:

> These cases have in common the element of an undefinable
> boundary for the beginning and ending of the claimant's work
> environment. The very nature of the employments rendered that
> environment amorphous. And yet, it is certain the claimants were
> placed in circumstances which were directly related to their

> employment. And, therefore, injuries arising out of those circumstances were compensable.

*Id.* at 392.

No Tennessee cases have addressed whether the "traveling men" exception should be extended to include taxicab drivers going to and from work. Citing ***Smoot v. Marks***, *supra*, Gleaves argues that the issue should be a question of fact for the jury and, thus, the trial court erred in granting summary judgment to Checker Cab. ***See Smoot***, 564 S.W.2d at 236-38; *see also **Buffalo Cab Co. v. Gurley***, 213 S.E.2d 545, 546 (Ga. App. 1975).

Although there may be occasions when this exception should apply to taxi drivers traveling to and from work, we agree with the trial court's finding that Mosley was acting beyond the scope of his employment. A reasonable jury simply could not find that a driver of a passenger-less taxicab who attempts to outrun a police car while on his way home was acting within the scope of his employment. Not only was Mosley's conduct in derogation of the law, it is inconceivable that Mosley's conduct was "actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228 (1)(c). There is no contention, for instance, that Mosley was attempting to elude the police so that he could speedily transport a passenger to a particular destination or pick up a passenger. Gleaves has failed to offer any suggestion whatsoever that Mosley's conduct was intended to enure to the benefit of Checker Cab. In addition, Mosley's conduct does not qualify as "similar to or incidental to the conduct authorized" by Checker Cab. *Id.* § 229. Because we find that Mosley's conduct was "clearly beyond the scope of his authority," the trial court properly granted summary judgment to Checker Cab on the issue of *respondeat superior*. ***Tennessee Farmers***, 840 S.W.2d at 937. Since Mosley's conduct was beyond the scope of his authority, he was not operating the taxicab under the franchise, and Checker Cab is not responsible for his conduct. Thus, it follows that summary judgment should have been granted to Checker Cab under the ordinance.

In addition to the trial court's dismissal of the common law *respondeat superior* claim, Gleaves presents issues of whether the trial court erred in dismissing his actions for negligent hiring, negligent supervision, and Restatement (Second) of Torts, § 317 (1964). We first note that although Gleaves contends that the trial court erred in granting summary judgment on all of these theories, Gleaves is precluded from obtaining a new trial since he failed to appeal his

judgment against the co-defendant, City of Lakewood. ***Samuelson v. McMurtry***, 962 S.W.2d 473 (Tenn. 1998).

In ***Samuelson***, the plaintiff sued several defendants, including Dr. Mark Totty, for medical malpractice. The trial court severed the action against Dr. Totty after granting him a motion for summary judgment and a motion to dismiss. The plaintiff proceeded to trial and the jury found liability and apportioned fault among the remaining defendants. The plaintiff accepted payment of this judgment against the defendants and did not appeal any action of the trial court regarding these defendants. The plaintiff, however, appealed the trial court's decision to sever and dismiss his suit against Dr. Totty.

The Supreme Court held that although the trial court erred in dismissing and severing the plaintiff's claim against Dr. Totty, the plaintiff was not entitled to a new trial since he failed to appeal the judgment rendered against the other defendants. ***Id.*** at 476. The Court stated:

> Despite the plaintiff's insistence that relief can be granted on the record before the Court, the Court finds that the plaintiff's failure to appeal the judgments against the defendants other than Dr. Totty was fatal to his right to a new trial. Perhaps the plaintiff could not have anticipated the precise decision that would be rendered by the Court on the issues presented, but the plaintiff chose to accept payment in satisfaction of the judgment against the defendant Holland, thereby precluding an appeal that would have allowed the Court to do justice for all the parties.
>
> The Court has been referred to no authority that would allow it to set aside a final judgment against a defendant who is not a party to the appeal and who has paid the judgment and received from the plaintiff an acknowledgment of full satisfaction.

***Id.***

In the instant case, the jury attributed seventy (70%) percent of the fault to Mosley and thirty (30%) percent to the City of Lakewood. If a new trial were granted, the City of Lakewood, which is not a party to this appeal, may be prejudiced: it would be forced to expend resources defending itself again in a new trial and it would encounter the possibility that a jury would assess more damages to it.[4] Accordingly, under the principle set forth in ***Samuelson***, we hold that Gleaves is barred from appealing the trial court's granting of summary judgment to Checker

---

[4] Even if a rule of law existed whereby the City of Lakewood would not be held liable for more than the judgment against it in the original trial, an equitable result would not ensue. First of all, it would be forced to represent itself in the second trial. Alternatively, if it chose not to represent itself, the remaining defendants may attribute an inequitable amount of fault to the defenseless and disinterested defendant, thus prejudicing the plaintiff.

Cab on the issues of negligent hiring, negligent supervision, and Restatement (Second) of Torts § 317.

The *Samuelson* rule should not apply to the *respondeat superior* claim because whether Checker Cab is vicariously liable for the negligence of Mosley has no bearing on the allocation of fault assessed by the jury between Mosley and the City of Lakewood. Thus, the unappealed jury verdict assessing seventy (70%) percent of the fault to Mosley would not be disrupted. If a new trial were granted, the sole determination would be whether Checker Cab would be responsible for damages corresponding with that percentage of fault that was attributed to Mosley. The policy reasons supporting the principle articulated in *Samuelson* would not be applicable, since the City of Lakewood could not be prejudiced by such a trial limited to this determination. However, as we previously noted, summary judgment was appropriately awarded to Checker Cab on the merits.

Moreover, on the merits of Gleaves's negligent hiring, negligent supervision, and Restatement (Second) of Torts § 317 claims, we find that summary judgment was appropriate for these claims. Proximate causation is an "essential element" for establishing a claim for negligence. *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 181 (Tenn. 1992). In *Corder v. Metropolitan Government of Nashville*, 852 S.W.2d 910, 915 (Tenn. App. 1992), the Court held that an employer may not be held liable for negligent hiring in the event that the employee's tortious conduct was committed outside the scope of his or her employment. The Court stated:

> The reason for this is that the hiring of the employee is not the proximate cause of his acts committed outside the scope of his employment. If this were not true, every employer who hires a careless employee would be liable for every careless act of the employee even though not committed in connection with his work.

*Id.* (citing *Nishan v. Godsey*, 166 F. Supp. 6 (E.D. Tenn. 1958)); *see also Phipps v. Walker*, No. 03A01-9508-CV-00294, 1996 WL 155258, at *4 (Tenn. App. Apr. 4, 1996). Because Mosley's conduct was outside the scope of his employment due to the aforementioned reasons, Gleaves is unable to satisfy the element of proximate causation and, thus, summary judgment was appropriate for his negligent supervision and hiring claims. *See Linder Constr.*, 845 S.W.2d at 173 ("Ordinarily, the proximate cause of an injury is for the jury, but where the facts are not controverted, the question of proximate or intervening cause is for the trial court.")

In addition, even if Gleaves were permitted to appeal the trial court's dismissal of his Restatement (Second) of Torts § 317 claim, we would affirm this ruling as well. Section 317 states that a master has a duty "to exercise reasonable care so to control his servant while acting *outside the scope* of his employment" under certain circumstances. (emphasis added). Tennessee has never expressly adopted this provision as creating a cause of action. In *Nichols v. Atnip*, 844 S.W.2d 655 (Tenn. App. 1992), the Court stated:

> The common law rule that persons have no duty to protect others from harm they did not cause, while harsh, remains the law. It is perhaps inevitable that extreme cases involving morally outrageous and indefensible conduct will cause inroads into this rule.

*Id.* at 662. We would not find that the instant case warrants an exception to the common law rule.

In sum, the judgment of the trial court against Checker Cab is reversed, and plaintiff's action against Checker Cab is dismissed. The judgment in all other respects is affirmed, and the case is remanded for such proceedings as may be necessary. Costs of the appeal are assessed to appellee.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**DAVID R. FARMER, JUDGE**